UNITED STATES of America,
Plaintiff-Appellee,

v.

Enrique Leonel GONZALEZ, Jose Antonio Suarez and Jose Enrique Mendez-Galbart, Defendants-Appellants.

No. 73–2193.

United States Court of Appeals,
Fifth Circuit.

March 27, 1974.
Rehearing and Rehearing En Banc
Denied May 14, 1974.

Sidney A. Soltz, Miami, Fla., for Mendez-Galbart.

Ronald J. Fath, Miami, Fla., for Gonzalez and Suarez.

Robert W. Rust, U. S. Atty., Harold F. Keefe, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before GEWIN, THORNBERRY and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Jose Antonio Suarez, Enrique Leonel Gonzalez and Jose Enrique Mendez-Galbart appeal from their convictions for conspiracy to violate and various substantive violations of 21 U.S.C. § 841(a)(1), which proscribes the sale or distribution of heroin and cocaine, and 18 U.S.C. § 2. Suarez and Gonzalez were charged and convicted on all counts of the seven count indictment,[1] and Men-

---

1. The indictment in pertinent part reads as follows: Count I charges that Gonzalez, Suarez and Mendez conspired from December 6, 1971, up until the date of the indictment in November 1972 to violate 21 U.S.C. § 841 (a)(1) and 18 U.S.C. § 2; Count II charges that on December 10, 1971, Gonzalez and Suarez knowingly and intentionally possessed with intent to distribute 514 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count III charges that on December 10, 1971, Gonzalez and Suarez knowingly and intentionally distributed 514 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count IV charges that on December 10, 1971, Gonzalez and Suarez knowingly and intentionally possessed with intent to distribute 508 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count V charges that on December 10, 1971, defendants Gonzalez and Suarez knowingly and intentionally distributed 508 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count VI charges that on December 30, 1971, Gonzalez, Suarez and Mendez knowingly and intention-

dez was charged and convicted on three counts.[2] The defendants raise numerous points of error,[3] all of which we find meritless and therefore affirm.

■ Defendants first argue that the trial court improperly admitted into evidence testimony of a rebuttal witness regarding alleged prior misconduct for which no conviction had been obtained. During the trial Gonzalez took the stand and testified, in response to questions asked by his counsel on direct examination, that he had never dealt in cocaine or heroin. On cross examination the government asked the defendant whether he had "ever dealt in cocaine or heroin," had "ever negotiated with anyone for the sale of any cocaine or heroin," or had ever "discussed the sale or purchase of heroin with anyone." Gonzalez replied that he had never "dealt in" or "done any business" in cocaine or heroin and had not "talked about" the sale of heroin to anybody. Subsequently, the prosecution called a rebuttal witness, Emilio. Garcia, who testified that in 1965 Gonzalez allegedly dealt in marijuana and that in 1973 he had negotiated with Gonzalez regarding an ultimately unconsummated purchase of one-half kilogram of cocaine.

The trial court properly admitted the rebuttal testimony. The Supreme Court in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), recognized that, when the defendant on direct examination initiates an inquiry regarding specific prior conduct other than a criminal conviction, the prosecution may bring forth extrinsic evidence in an attempt to establish prior conduct contrary to the defendant's assertion. In

*Walder* the defendant took the stand and, in response to questions propounded on direct examination, broadly asserted that he had never possessed, sold, handled as a conduit or given without compensation any narcotics to anyone. The Supreme Court held that the trial court properly admitted the rebuttal testimony of two witnesses establishing defendant's dealings in narcotics from evidence obtained in an unlawful search and seizure of defendant's home some years earlier. Likewise, only after the defendant in the case at hand opened the inquiry on direct examination did the trial court admit testimony to specifically rebut defendant's general denial of ever dealing or negotiating for the sale of such proscribed substances.

■ Relying on United States v. Masino, 275 F.2d 129 (2nd Cir., 1960), and United States v. Sweeney, 262 F.2d 272 (3rd Cir., 1959), the defendants argue that proof of prior acts of misconduct other than a criminal conviction may not be shown by extrinsic evidence such as rebuttal testimony. Instead, they assert that the examiner is limited to the answer that is elicited from the witness on cross examination. *See* C.McCormick, Evidence, § 42, at 84 (2d Ed.1972); 3A J.Wigmore, Evidence, § 979 (Chadbourn Rev.Ed.1970). But at least one recognized limitation on this principle is that when the inquiry is initiated on direct examination rather than cross examination, the prosecution may bring forth extrinsic evidence to demonstrate the mendacity of the witness' statements. Jackson v. United States, 311 F.2d 686, 690 (5th Cir., 1963); *see* White v. United States, 317 F.2d 231, 233 (9th Cir., 1963).

---

ally possessed with intent to distribute 523 grams of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and Count VII charges that on December 30, 1971, Gonzalez, Suarez and Mendez knowingly and intentionally distributed 523 grams of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

**2.** Mendez was indicted for conspiring to violate 21 U.S.C. § 841(a)(1) and 18 U.S.C. §

2 under Count I, knowing and intentional possession with intent to distribute 523 grams of heroin under Count VI, and knowing and intentional distribution of 523 grams of heroin under Count VII.

**3.** Each appellant adopts the asserted points of error of the others. Our ruling on these points in no way determines each appellant's standing to raise the particular issue.

■ Second, the defendants contend that the trial court erroneously admitted evidence of criminal conduct other than the specific sale of narcotics alleged in the indictment. At trial Special Agent William Hudson testified, over defense counsel's objection, that while meeting with defendants Luis Inchausti-Lopez, who plead guilty and testified for the government, and Suarez, Inchausti stated that Suarez had access to three kilos of cocaine and that this cocaine was to be sold to customers in Detroit. Additionally, Agent Hudson related that during a subsequent meeting with Gonzalez in February 1972, Gonzalez mentioned that he had been dealing in narcotics for some time.

The trial court properly admitted Hudson's testimony concerning such closely related activities. In our recent opinion of United States v. Nakaladski, 481 F.2d 289 (5th Cir., 1973), we reiterated the view that "although evidence of criminal conduct not charged in the indictment may not be admitted if it serves solely to show the defendant's bad character or criminal propensities, . . . the testimony . . . was not admitted for that purpose." *Id.* at 296. In *Nakaladski* we held certain testimony relevant and admissible "because it established that appellants had entered into a conspiracy" to engage in extortionate credit transactions. *Id.* Like the testimony in *Nakaladski*, Hudson's testimony was not admitted to establish the defendant's propensities to commit the charged crimes, but was properly admissible to establish the existence of a conspiracy to distribute narcotics. *See* United States v. Restrepo, 417 F.2d 927, 928 (5th Cir., 1969).

■ Additionally, the trial court, when admitting the evidence concerning transactions not the subject of the indictment, was careful to instruct the jury that it was admissible against all of the defendants only if it concluded that a conspiracy existed. On at least three occasions during the trial, the court suspended the presentation of the case and orally instructed the jury of the reason for admitting the evidence, and no one on the jury indicated that he did not understand. At the conclusion of the case, the court in its general instructions again instructed the jury of the limited use of this evidence. The rights of the defendants were fully protected from any possible prejudice resulting from the admission of this evidence.

Defendants' third contention is that, assuming a conspiracy existed, the principal objective of the conspiracy was achieved by December 30, 1971, when the final sale of one-half kilo of heroin was consummated, and that at this point the conspiracy terminated. Accordingly, the defendants reason that any evidence of discussions and meetings subsequent to this asserted point of termination was improperly admitted as against all the defendants. More specifically, Mendez argues that, since the conspiracy had terminated, the trial court erred in failing to instruct the jury that these subsequent occurrences could only be admitted as against the particular person who committed the act or made a declaration and not against him because his participation terminated on December 30. The defendants further urge that the evidence introduced at trial supports the existence of two conspiracies instead of only one, and thus the admission of evidence relating to the second conspiracy was prejudicial to the participants of the first.

In order to determine the validity of this contention, we turn to the record. The evidence introduced at trial demonstrated that there were two controlled purchases of narcotics in December of 1971. The first purchase was set up by the government informant, Armando Monnar, after he was solicited by Luis Inchausti-Lopez to sell drugs. Inchausti's source of supply apparently was the defendant Gonzalez. The first sale was made at a meeting at the Holiday Inn in Miami when Inchausti and Monnar sold Agent Hudson an initial one-half kilo of cocaine. Monnar testified that immedi-

ately prior to the sale defendants Suarez and Raul Villareal-Reyes,[4] who arrived shortly before the transaction, stepped outside so as not to be noticed. Although it was necessary for Inchausti to leave in order to obtain an additional one-half kilo, after several hours the total purchase of a kilo of cocaine was finally completed. When Hudson left, Suarez and Villareal entered the room, Lopez handed them the money, they counted it, gave Monnar $500 and left.

On December 30, 1971, Monnar contacted Villareal concerning a second purchase of narcotics, this time of heroin, and a transaction was arranged for the following day. On the day of the purchase, Gonzalez, Villareal and Monnar met at a Citgo filling station operated by Gonzalez. Gonzalez told Villareal to get the merchandise, and approximately twenty minutes later Villareal returned with two boxes filled with heroin. Heroin in hand, Monnar and Villareal went to a Howard Johnson's where they met with Agent Peter Scrocca. Because Villareal arrived late, Scrocca refused to purchase the whole kilo, but purchased instead only a half kilo. After this second sale was completed, Villareal and Monnar returned to the Citgo gas station where Monnar explained to Gonzalez why only one-half of the heroin had been sold. At this time defendant Mendez entered the station, walked into the back room, and according to Monnar's testimony, asked "How did the heroin deal come out?" Gonzalez responded that he had the money and, as Monnar testified, allegedly told Gonzalez to retain it "until we straighten the bill with you."

Significantly, after the sale on December 30th, the evidence demonstrates that there were meetings between several of the defendants. Approximately two weeks after the second sale, Villareal, Gonzalez, Suarez and informant Monnar met and generally discussed the possibility of future narcotic sales. On February

ary 9, 1972, March 2, 1972 and April 14, 1972, government agents met with Gonzalez and discussed, not surprisingly, additional sales of narcotics. More conversations were had with Suarez concerning narcotics on February 29, 1972, May 10, 1972 and October 29, 1972. Shortly thereafter, in November, the defendants were indicted.

■ Our review of the evidence compels the conclusion that there was only one conspiracy that existed up until the date of the indictment, and consequently the evidence concerning subsequent meetings and discussions was properly admitted. The Supreme Court has formulated the standard for determining when there are one or more conspiracies as whether "a common end or single unified purpose" is to be achieved by the conspirators. United States v. Morado, 454 F.2d 167, 171 (5th Cir., 1972); United States v. Lloyd, 425 F.2d 711, 712 (5th Cir., 1970); see Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The common end or single purpose of the conspiracy in the case at hand was the unlawful sale of narcotics, particularly heroin and cocaine. Furthermore, persons so associating and forming organizations for furthering such illicit purposes do not normally conceive of the association as engaging in one unlawful transaction and then disbanding. Rather the nature of such organizations seems to be an ongoing operation, engaging in the enduring and profitable business of supplying drugs and grimly reaping large sums of money from society to the detriment of our country in general and the narcotics used in particular. The sales of narcotics in the instant case appear to be only two sales within a much larger scheme of conducting a continuing and profitable trade in illicit narcotics.

---

4. Villareal was charged in all seven counts of the indictment, but apparently was not tried because he is a fugitive.

Moreover, the same persons were engaged in the initial sales of narcotics as were involved in the subsequent meetings and discussions. Simply because one defendant, Mendez, was absent from the meetings or his name was not mentioned does not establish his disassociation from the presumably continuing operation. There is sufficient evidence in the record to support the court's conclusion that a single conspiracy existed up to the date of the indictment, and thus evidence of meetings and discussions occurring after December 30, 1971, was properly admissible. Jolley v. United States, 232 F.2d 83, 88 (5th Cir., 1956).

Fourth, defendants argue that the trial court improperly refused to separately instruct the jury to carefully scrutinize an informer's testimony because of the inherent possibility of untruthfulness.[5] Government informer Monnar testified at trial and related in detail the events that surrounded and culminated in two sales of narcotics in December of 1971. While there was other testimony associating defendant Mendez with the co-defendants and placing him on several occasions at the Citgo gasoline filling station operated by Gonzalez, Monnar's testimony is essentially the only evidence that seriously implicates Mendez as a participant in the charged crimes. The defendants submitted to the court a proposed instruction that would have informed the jury to closely scrutinize informer testimony, but the court declined to give this particular instruction. Instead, the trial court instructed the jury, in addition to the general instruction regarding witness credibility, that "[t]he testimony of an accomplice or an informer who provides testimony against a defendant under grant of immunity from punishment or with a promise of reward should be viewed with great caution and

weighed with great care." Counsel timely objected to the court's charge.

■ Because the judiciary has recognized that a criminal conviction may stand when based solely on the uncorroborated testimony of an informant or accomplice, it has been careful to fully apprise the jury of the inherent possibility of such testimony's untruthfulness. United States v. Kinnard, 150 U.S.App. D.C. 386, 465 F.2d 566, 570 (1972). Although the giving of an accomplice or informant credibility instruction is largely within the discretion of the trial court, there are instances in which the defendant is entitled to such an instruction. United States v. Collins, 472 F.2d 1017, 1018–1019 (5th Cir., 1972); Tillery v. United States, 411 F.2d 644, 648 (5th Cir., 1969); Williamson v. United States, 332 F.2d 123, 132–133 (5th Cir., 1964). The defendants in the case at hand were entitled to an informer credibility instruction because they specifically requested it, and the testimony implicating defendant Mendez's guilt was elicited solely from a government informer.

■ But while the defendants were entitled to such an instruction under the circumstances of this case, the trial court was not obligated to give an instruction regarding accomplice testimony and also separately instruct the jury on an informer's testimony. The defendants argue that the substance of the two instructions would be significantly different, and therefore the court should have given an additional instruction. We cannot agree. The purpose of giving the instruction in both instances is to inform the jury of the witness' self-interest and therefore the possibility of fabrication. Because the reason underlying the giving of the instruction is the same in both instances, irresistible logic compels the conclusion that the sub-

---

5. Also with regard to requested jury instructions, the defendants contend that the trial court improperly denied counsel's request to give a particular instruction concerning witness credibility in light of prior inconsistent

statements. We agree with the trial court, however, that this instruction was covered in the court's general charge regarding witness credibility.

stance of the instruction is essentially the same. While the trial court, in the exercise of its discretion, could instruct separately in order to more fully protect the rights of the defendants, we feel sure that the combined instruction concerning accomplices and informers in the instant case adequately informed the jury to carefully examine such testimony.

This conclusion is supported in two significant respects. First, although the specific portion of Monnar's testimony that implicates Mendez in the charged crimes is uncorroborated, his testimony was corroborated in several other significant particulars, thus tending to establish its reliability. *See* Davis v. United States, 411 F.2d 1126, 1128–1130 (5th Cir., 1969); Joseph v. United States, 286 F.2d 468, 469 (5th Cir., 1960). Testimony of other witnesses established that the initial meeting between the informant and Inchausti was on December 6th, that there was a sale of a kilo of cocaine on December 10th, and a sale of one-half kilo of heroin on December 30th. Additionally, other agents who conducted surveillance testified that Mendez was seen at the Citgo station on several occasions. Second, the informant's testimony was not unbelievable or facially insubstantial. United States v. Morales, 477 F.2d 1309, 1312–1314 (5th Cir., 1973). Monnar testified inconsistently regarding the compensation he received for his services, prior instances of his acting as an informer for the government, and the return to Hudson of $500 given him by Villareal when the first narcotics transaction was completed. But such inconsistencies do not render the whole of his testimony completely unreliable or incredible. Monnar's testimony related in detail the events and circumstances surrounding the two sales of narcotics, and as noted previously this testimony was specifically corroborated in several instances. Consequently we are unable to conclude that his testimony was so incredible or insubstantial as to be incapable of belief.

The defendants' fifth contention is that the government suppressed evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Supreme Court in *Brady* plainly proscribed governmental suppression of evidence that exculpated the defendant. Construing *Brady*, this court in Williams v. Dutton, 400 F.2d 797 (5th Cir., 1968), concluded that *Brady* "imposed an affirmative duty on the prosecution to provide at the appropriate time requested evidence which is materially favorable to the accused as direct or impeaching evidence." *Id.* at 800; *see* United States v. Harris, 458 F.2d 670, 675 (5th Cir., 1972). More recently, the Supreme Court in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), clearly articulated three criteria for measuring when the *Brady* rule has been violated as follows: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Id.* at 794–795.

Measured against these criteria, we conclude that there has been no *Brady* violation. Nothing in the record indicates that the government was attempting to suppress any evidence. Prior to Monnar's testimony, the government delivered all statements to the defense. During trial, when Agent Hudson was testifying, the defense asked for a daily activity report that Hudson might have made at his first meeting with the informant Monnar. The government responded that it had no information of this nature, defense counsel apparently accepted this answer, and the matter was not further pursued.

Additionally, defense counsel became fully aware during trial that Monnar had made inconsistent statements in light of Agent Hudson's subsequent testimony. Counsel had ample opportunity, indeed an obligation to the defendants, to bring the contradictions to the attention of the jury by recalling Monnar to the witness stand and reexamining him,

or in closing argument, or both, and presumably they did so. *See* United States v. Cawley, 481 F.2d 702, 709 (5th Cir., 1973); United States v. Tashman, 478 F.2d 129, 131 (5th Cir., 1973). Consequently, we are unable to conclude that the government has suppressed evidence.

Finally, there is no merit to defendant Mendez's contention that his twelve year sentence and $15,000 fine was improper. This term and fine is well within the maximum authorized by statute. *See* United States v. Rojas-Colombo, 462 F.2d 1091 (5th Cir., 1971).

The judgments of the district court are affirmed.