**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joe GARCIA, Guillermo Sandoval, and
Mario Sandoval,
Defendants-Appellants.**

**No. 75–1822.**

United States Court of Appeals,
Fifth Circuit.

March 10, 1976.
Rehearing and Rehearing En Banc
Denied April 26, 1976.

582

Manuel Almaguer, Dallas, Tex. (Court-appointed), for Garcia.

John K. Rothpletz, Dallas, Tex. (Court-appointed), for G. Sandoval.

Kenneth E. Labowitz, Charles L. Caperton, Dallas, Tex., for M. Sandoval.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Dallas, Tex., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

Appellants in this case, Joe Garcia, Guillermo Sandoval, and Juan Mauro Sandoval (referred to herein as he was in the indictment and at trial as Mario Sandoval) were indicted on June 13, 1974, in the United States District Court for the Northern District of Texas, Dallas Division. The three-count indictment charged in Count 1 that appellants and six other persons engaged in a conspiracy from prior to January 9, 1974 until June 5, 1974 to possess with intent to distribute and to distribute heroin; of the sixteen overt acts alleged in this count, Joe Garcia was named in eight, Guillermo Sandoval in six, and Mario Sandoval in three. Count 2 of the indictment charged appellant Guillermo Sandoval with the distribution of approximately three ounces of heroin to Delphin von Briesen, Jr., a Drug Enforcement Administration (DEA) agent, on or about April 1, 1974. Count 3 alleged that appellant Joe Garcia possessed with intent to distribute approximately 2.2 pounds of heroin on or about June 5, 1974.

Appellants[1] were tried jointly before a jury and found guilty as charged. Appellant Garcia was sentenced on Counts 1 and 3 of the indictment to concurrent prison terms of 20 years, to be followed by six years of special parole. Appellant Guillermo Sandoval was sentenced on Counts 1 and 2 of the indictment to concurrent prison terms of 15 years, to be followed by six years of special parole. Appellant Mario Sandoval was sentenced on Count 1 to a prison term of 10 years, to be followed by a three-year term of special parole.

The Government's case depended largely, and in the instance of appellant Mario Sandoval entirely, on the testimony of Gonzalo Castillo Marquez. Marquez had for two years been a "special employee" of the Drug Enforcement Administration. This arrangement was highly informal; Marquez had no written contract of employment, and he was paid an unexpected amount at the termination of each case he prepared, assuming that the DEA had, at that point, funds out of which to pay him. Marquez testified that: "Every time they do pay me, that it is even a surprise to me[sic]." His supervisor at the DEA testified that between June 29, 1973 and January 2, 1975, the DEA made thirty payments to Marquez, for a total payment of $31,675.75. Marquez had worked on approximately ten cases and testified in all but two. He was not required to submit time cards or vouchers for expenses; he was reimbursed for expenses but the amount was based on his word and on

---

1. Co-defendant Vincent Carrerra was indicted on Count 1 and tried jointly with appellants. He was found guilty as charged and filed a Notice of Appeal. However, his appeal was dismissed on June 24, 1975, for failure to timely docket the record. Co-defendant Joe Leal pleaded guilty to Count 1 of the indictment. The arrest warrants as to the other four persons indicted remain unexecuted.

the observations of the DEA agents with whom he worked. The proof admitted at trial showed that Marquez's employment was irregular; that the government did not withhold tax from Marquez's bonus payments; and that Marquez waited until two weeks before trial to file his income tax returns for 1973 and 1974, claiming that until then he believed that his salary was tax-free.

The following recitation of the facts is what was testified to by the informer, Marquez: Marquez testified that in early January, 1974, he was approached by Joe Leal, whom he had known for approximately a year and a half. Leal offered to introduce Marquez to various people he knew in Laredo if Marquez could give Leal a ride to Laredo so that he could purchase heroin there. Marquez agreed. Marquez, Leal, and Leal's wife and brother, arrived in Laredo on January 10, 1974; they went to the home of appellant Guillermo Sandoval. Leal asked for heroin, and Sandoval took them to another home where he procured a gram of heroin; they then returned to Sandoval's house where he and the Leals injected the heroin. Leal explained to Sandoval that Marquez wished to purchase heroin, and Sandoval said that it would be no trouble but that they should return in the daytime. Marquez picked Guillermo Sandoval up the next morning and they proceeded to a methadone clinic where Sandoval obtained his medicine. Marquez and Sandoval then went to a house that had been converted into a garage; Sandoval entered and spoke with Mario Sandoval. After about ten minutes, Guillermo Sandoval returned to the car and directed Marquez to drive to another location. There he told Marquez that he and Mario Sandoval had a pound of heroin, but it was across the river. Guillermo Sandoval and Marquez then returned to the garage; Guillermo Sandoval brought Mario Sandoval to the car, and Mario told Marquez that he had eight ounces of heroin, and that "they" had another pound across the river. Mario Sandoval told Marquez the price would be $650 in Laredo; answering Marquez, he also said it would be $750 if delivered to Dallas. Mario Sandoval, along with another man, then left for samples; when they returned in about 25 minutes, all four men entered the house. Marquez then tested the samples. Guillermo Sandoval told Mario Sandoval that Marquez was also interested in cocaine; Mario said he knew a man in Laredo who could supply it. Guillermo gave Mario some money for heroin for the Leals. Mario and his companion again left, returning in about half an hour.

Mario then introduced Marquez to yet another man, who gave Marquez a sample of cocaine. Mario told Marquez he was waiting for his pound of heroin to come across the river, and that if he wished Marquez could buy it in about four days. Marquez declined to take the eight ounces Mario had with him because one of his companions was an addict. Mario told Marquez to carry out further transactions through Guillermo, and Guillermo gave Marquez his phone number. Guillermo and Marquez then left to pick up the Leals; they all returned to Dallas late that night.

According to Marquez, he had no further personal dealings with Mario Sandoval. As Marquez's testimony continued, he stated that he next spoke to Guillermo Sandoval when Guillermo called him on March 24, 1974, saying he was in Fort Worth delivering heroin and would give some to Marquez. When they met, Guillermo told Marquez that this was the same heroin that Mario was going to deliver to Dallas and that Mario was the connection. On March 30, Guillermo called Marquez and said his connections were ready; Marquez again ascertained that it was "Mario's stuff." Guillermo said he also had three ounces to get rid of and Marquez agreed to take it. Guillermo told Marquez to go to Laredo. Marquez next called Guillermo from the Holiday Inn in Laredo and then went by and picked him up; he told Guillermo that he would only buy the pound if it were delivered to Dallas, but asked if he could have the three ounces "on consignment" in the meantime. Guillermo made a phone call, which he said was to

Mario, and then said it would be alright. [Marquez's testimony that this call was to Mario was objected to and stricken.] The two men proceeded to Guillermo's home, where shortly thereafter a 1954 Chevrolet appeared. Guillermo went to the car and conversed with the driver.

Marquez and Guillermo then went back to the Holiday Inn. In Marquez's room, Guillermo showed him a plastic bag containing heroin. They put it in another plastic bag that said "Holiday Inn;" they then joined Mrs. Sandoval and drove to Dallas, arriving about midnight on April 1, 1974. After leaving Mrs. Sandoval at a motel, Guillermo and Marquez drove to a club where they met DEA agents von Briesen and Hollenshead; they all proceeded to a second club, where Sandoval sold von Briesen three ounces of heroin for $2100, and agreed to make another delivery. The next day Guillermo Sandoval and his wife returned to San Antonio. On April 5, 1974, after a phone call from Sandoval, Marquez flew to Laredo; but when he arrived Guillermo told him that his connection, Mario Sandoval, had a problem and delivery would be delayed until April 11. He asked for a $10,000 advance on a kilo but Marquez refused. On April 8, he again called Marquez and told him all was ready; Marquez drove to Laredo and again to the Holiday Inn. Guillermo told Marquez he still needed the $10,000; when Marquez said he did not have it, Guillermo told Marquez to stay in town a few days, and that if his first connection failed he had another. He also told Marquez to have his people come down with the money. Von Briesen, Hollenshead, and another DEA agent did go to Laredo. On April 11, 1974, Guillermo Sandoval brought appellant Joe Garcia to Marquez's room at the Holiday Inn; Guillermo told Marquez that Garcia had an ounce of heroin. Later, Guillermo alone met with two of the agents and Marquez and told them Ma-

rio couldn't come through, but that he had another connection.[2] The agents persuaded Guillermo to introduce them to his new connection; that night they met Garcia in a parking lot. Garcia told von Briesen that he was afraid to deal heroin because it was "too hot," but he nonetheless offered von Briesen a kilo of cocaine in return for a $5000 advance on the heroin; von Briesen declined. After several meetings between Garcia, Marquez, and, on two occasions, DEA agent Alvarez, on May 27, 1974, Garcia call Marquez and they agreed on a sale in Laredo. On May 29, Marquez and agent Alvarez drove to Laredo, followed by DEA agents von Briesen and Mike Harper. Late that afternoon Garcia and co-defendant Vincent Carrerra met Marquez and Alvarez and delivered a sample. Later that evening, Garcia delivered to Alvarez an additional amount, for which Alvarez paid $7500. Garcia was supposed to deliver the rest the next day, but was unable to. After some misadventure, he finally delivered a kilo to agent von Briesen in Dallas on June 4, 1974. At that point, he was arrested.

The foregoing recital of facts is that of Marquez; his testimony was corroborated by DEA agents von Briesen and Alvarez as to the incidents in which they were involved which related to distribution and possession by Guillermo Sandoval and Joe Garcia respectively. No agent, however, corroborated Marquez's testimony that Mario Sandoval was mentioned by Guillermo Sandoval as a source on one occasion when two agents were present.[3] Guillermo Sandoval and Joe Garcia admitted having transferred the drugs to the agents, but differed with Marquez on several points, and argued that they had been entrapped. Mario Sandoval flatly denied even having spoken with Marquez.

Guillermo Sandoval's rebuttal of Marquez's testimony began with the first in-

---

**2.** Although the agents present at this meeting, von Briesen and Hollenshead, both took the stand, neither corroborated Marquez's testimony that Guillermo mentioned Mario Sandoval.

**3.** See n. 2, *supra.*

cident Marquez had described. Marquez had testified that when he met Guillermo Sandoval, on the night of January 10, 1974, Sandoval and the Leals went out to buy heroin and returned and injected it. Sandoval and his wife denied that he left his home that night; furthermore, Pete Cantu, program director for the Laredo Drug Treatment Program, presented evidence of urine specimens that established that Sandoval had not taken heroin during this time period. Sandoval also testified that he did not readily offer to procure heroin for Marquez; rather, he testified that he repeatedly told Marquez that he intended to stay on methadone and away from other drugs. Guillermo Sandoval also countered Marquez's testimony that he had said he would take Marquez to some of his relatives; the alleged relative was Mario Sandoval, and Guillermo testified that although they had seen each other they were not only not related, they were not really acquainted with each other.

Guillermo Sandoval testified that after his first meeting with Marquez, when he refused to deal heroin, Marquez continually called his mother's home in an attempt to convince him to deal heroin. Finally, according to Sandoval, on April 1st, Marquez arrived at his home and gave him $15 to get him a sample; Sandoval agreed to do so and even went looking for heroin, but enroute he was stopped by a federal agent and searched and again decided not to get involved with heroin. Marquez then asked him to come to Dallas to see the people he (Marquez) was working with; he offered Sandoval $500 and guaranteed payment regardless of whether Sandoval decided to work with him. Sandoval agreed and made the trip. It was on that trip that he handed von Briesen a package of heroin for which, in return, he received $2100. Sandoval testified that Marquez had the heroin and asked him to be the one to hand it over, so he did. Sandoval admitted that before making the sale, at Marquez's request he "tested" the heroin.

Guillermo Sandoval also testified that he did not know Mario Sandoval personally and that he had never been told Mario Sandoval dealt in heroin. He stated that he did not know Joe Garcia until February 1974, when he met him at the methadone program; he admitted introducing Garcia to Marquez, but stated that it was because Garcia wanted to buy heroin, not to sell.

The gist of Sandoval's testimony was that he resisted involvement under tremendous pressure from Marquez, who kept offering him substantial sums of money for help in procuring heroin. Although he admits handing the heroin to Agent von Briesen on one occasion, he denies that he was the source of it and states instead that Marquez was.

Joe Garcia testified that he had voluntarily started the methadone program in Laredo in February; he met Guillermo Sandoval there. He let his participation lapse, and returned in April—but on the day of his arrival the offices had closed before he got there. In some distress, he asked Guillermo Sandoval, whom he saw on the premises, if he knew where he could get heroin. Sandoval said he did not because he wasn't involved in dealing—but then he remembered Marquez and took Garcia to him. Garcia testified that he went to Marquez only to buy heroin for personal use and that he had no intention of becoming involved in selling, but that over time Marquez talked him into it.

Mario Sandoval also took the stand in his own defense. His testimony totally contradicted that of Marquez, and was corroborated by that of Guillermo Sandoval. Mario Sandoval admitted that Guillermo Sandoval and Marquez came to his place of business—a mechanic's shop operated by Mario and his partner Ezra Reed—and that Guillermo Sandoval, whom he did not know but had seen around, asked him if he knew anyone who was selling dope. But he testified that he replied in the negative, and they soon left. They later returned and engaged in a separate conversation with some other people in the same room

Reed and Mario were in; shortly Mario and another man left for beer and returned with it. Mario Sandoval testified that he did not see any dope change hands that day. Mario's testimony was fully supported by that of his partner Reed who, though present, was of course in no way involved or prosecuted. Guillermo Sandoval had testified that he took Marquez to the shop not specifically to see Mario Sandoval but because he had heard there were people who dealt in heroin at that address; Mario Sandoval testified that he and his partner rented the garage relatively cheaply ($25.00/month) because it had formerly been occupied by someone who had been convicted of dealing dope. Guillermo Sandoval also testified that he had never heard that Mario Sandoval was involved in heroin; the evidence showed that Mario had never been arrested, much less convicted, for any drug-related offense. In fact, the only blemish on his record was a fine for driving without a license.

■ Appellants Guillermo Sandoval and Joe Garcia argue that they were entrapped as a matter of law. Pertinent to the entrapment issue, the jury heard the conflicting accounts of the defendants and the informer Marquez concerning the defendants' involvement in the heroin distribution scheme. Additionally, as evidence tending to show predisposition and hence negate the traditional entrapment defense, both defendants admitted that they had previously pled guilty to drug-related charges. The jury was correctly instructed in accordance with the standards enunciated in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) and *United States v. Bueno,* 447 F.2d 903 (5th Cir. 1971). ·By its guilty verdicts, the jury indicated its refusal to credit defendants' story that it was Marquez who implanted the criminal design in defendants' mind. That decision was entirely reasonable, especially since Marquez's testimony on this point was bolstered by the prior crimes evidence. Thus we refuse to disturb the jury finding of no entrapment under the *Russell* standard. Since

both defendants received concurrent sentences on the conspiracy and distribution counts, we will not review the jury's finding with respect to the *Bueno* defense which relates solely to the distribution charge.

Appellants also argue that there is insufficient evidence to support the verdicts. This contention is grounded in the argument that the testimony of Marquez should be rejected because he was a paid informant. Before examining the law on this question, we would first note that there is a significant factual difference between the cases of Guillermo Sandoval and Joe Garcia, on the one hand, and Mario Sandoval on the other. Marquez's testimony as to Guillermo Sandoval and Joe Garcia was independently corroborated by DEA agents and, on some points, by the appellants themselves; but his testimony as to the involvement of Mario Sandoval was totally uncorroborated. Thus, Mario Sandoval's appeal requires separate consideration.

A. *Case Against Guillermo Sandoval and Joe Garcia.*

■ Guillermo Sandoval and Joe Garcia argue that Marquez's testimony should be rejected because he was an informant paid excessive sums for procuring evidence. As objectionable as this practice is, this Court has heretofore required additional facts before rejecting the testimony of the informant; specifically, we have condemned the use of a contingent fee where it involves the promised payment of a specified sum to convict a specified suspect. *Williamson v. United States,* 311 F.2d 441 (5th Cir. 1962).

But we have refused to extend this ruling to the situation where an informant is paid a subsistence allowance and given a reward, as long as there is no evidence that he had been promised a specific sum to convict a particular person. *United States v. Durham,* 413 F.2d 1003, 1004 (5th Cir.) (*per curiam*), *cert. denied,* 396 U.S. 839, 90 S.Ct. 100, 24 L.Ed.2d 89 (1969). We note that in the *Durham* case the amounts involved were

relatively small; the informant was paid $10/day plus a $400 reward at the end of his employment. *Id.* In this case, the amount paid the informant was alarmingly high. Yet, a decade ago we approved consideration of the testimony of an informant who had been paid $10/day and an $800 reward who "would not deny that he may have been paid a total of as much as $10,000." [The period of time covered is not mentioned.] *Sears v. United States,* 343 F.2d 139, 141, n. 1 (5th Cir. 1965). Thus, although the amount of payment involved in this case requires scrutiny and creates doubt as to the propriety of the practice of so heavily subsidizing informants, it does not of itself mandate reversal. In cases involving paid informants, not within the *Williamson* rule, we have traditionally looked to corroborating evidence and where, as here, it is clear and convincing, we have affirmed the convictions.[4]

We have also considered important whether or not the informant had been instructed to avoid entrapment, and there was testimony that Marquez was so instructed. *Bullock, supra,* 383 F.2d at 546; *Williamson v. United States,* 311 F.2d 441 (5th Cir. 1962). On the other hand, the practices that have been criticized were not shown to have been present; there is no evidence of guaranteed payment of specific sums or of an attempt to make a case against a specified suspect. *Williamson, supra,* 311 F.2d at 444. We would note, however, that when such a large sum as is involved here, $31,675.75, is paid out in a number of installments over such a relatively short span of time as 18 months, the payments necessarily approach a regularity that may in some cases be sufficient to establish guaranteed payments of reasonably specific sums. Such a

state of affairs was not made out in this case. Thus, in the absence of any forbidden use of the informant, and given the existence of corroborating evidence, we affirm the convictions of Guillermo Sandoval and Joe Garcia.

### B. Case Against Mario Sandoval.

 The appeal of Mario Sandoval is, however, quite distinct from that of his co-defendants; as we have noted, in his case there is absolutely no corroborating evidence for the testimony of Marquez. It is also noted that the record was silent as to any previous activity in the area of possession, use or sale of drugs by Mario, who took the stand and testified on his own behalf; additionally, both Guillermo Sandoval, who was not related to Mario, and Joe Garcia took the stand, and both testified in a manner that was completely exculpatory of Mario. And more significantly, neither of the DEA agents who, by Marquez's testimony, were at one meeting with him and Guillermo where Mario's name was mentioned supported Marquez's story.[5]

The sole charge to this jury relating to the credibility of witnesses was general in nature, cautioning the jurors to "give the testimony of each witness careful scrutiny . . ." and to take into consideration "any circumstances which tend to shed light upon the credibility of the witness." Mario Sandoval did not request any additional or different instructions as to Marquez although Marquez's uncorroborated testimony was the single source of evidence against him.

In this Circuit, a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it and the testimony implicating the accused is elic-

---

4. *See United States v. Oquendo,* 505 F.2d 1307 (5th Cir. 1975); *United States v. Jenkins,* 480 F.2d 1198 (5th Cir. 1973) *(per curiam),* cert. denied, 414 U.S. 913, 94 S.Ct. 256, 38 L.Ed.2d 151 (1973); *Heard v. United States,* 406 F.2d 705 (5th Cir. 1969) *(per curiam); Harris v. United States,* 400 F.2d 264 (5th Cir. 1968); *Moore v. United States,* 399 F.2d 318, 320 (5th Cir. 1968), *cert. denied,* 393 U.S. 1098, 89 S.Ct.

893, 21 L.Ed.2d 789 (1969); *Bullock v. United States,* 383 F.2d 545, 546 (5th Cir. 1967); *Hill v. United States,* 328 F.2d 988 (5th Cir.) *(per curiam),* cert. denied, 379 U.S. 851, 85 S.Ct. 94, 13 L.Ed.2d 54 (1964); *Puentes v. United States,* 319 F.2d 581 (5th Cir. 1963) *(per curiam).*

5. See n. 2, *supra.*

ited solely from the informer or accomplice. *United States v. Gonzalez,* 491 F.2d 1202 (5th Cir. 1974). *See generally, United States v. Lee,* 506 F.2d 111 (D.C. Cir. 1974), *cert. denied,* 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). The rationale behind this requirement is to insure that no verdict based solely on the uncorroborated testimony of a witness who may have good reason to lie is too lightly reached.

In this case, there was more than the usual need for a cautionary instruction. First and most important, the portion of Marquez's testimony which solely supplied the incrimination of Mario was totally uncorroborated by any other witness and was contradicted by Mario's own testimony and by the only two witnesses present on the day Marquez claims to have spoken with Mario. Second, Marquez was paid an extraordinarily high amount to act as an informer and the laissez-faire employment arrangement opened numerous potentials for abuse. Finally, the possibility that Marquez could be guilty of income tax evasion, which was permitted if not encouraged by the lack of withholding by the government, combined with the other circumstances to cast a dark shadow on the credibility of this witness.

If Mario Sandoval had requested an informer-credibility instruction, we would not hesitate to hold the failure to so charge the jury reversible error. Since no request or objection to the charge was made, we face the difficult task of deciding whether the failure to instruct rises to the level of plain error. Fed.R.Crim.P. 52(b). This Court has recognized that in reviewing a trial for plain error, the touchstone is fundamental fairness. *United States v. Collins,* 472 F.2d 1017 (5th Cir. 1972), *cert. denied sub nom. Branch v. United States,* 411 U.S. 983, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973). In *Collins,* we rejected the defendants' contention that the failure to instruct the jury on the credibility of an addict-informer amounted to plain error. Our decision rested on the ground that

the informer's testimony was extensively corroborated and that proof of defendants' guilt was strong and convincing. *Id.* at 1019.

When the case is close and the witness particularly unreliable, however, this Court has declared that the failure to give a cautionary instruction amounts to plain error. In *Williamson v. United States,* 332 F.2d 123 (5th Cir. 1964), we reversed an embezzlement conviction based solely on the uncorroborated testimony of an accomplice whose story contained several internal inconsistencies. Fully acknowledging that the jury has the right and duty to assess the credibility of witnesses, we recognized that in an exceptional case a jury verdict must be set aside if the reviewing court is convinced that a fair trial required that the jury be properly instructed on the evaluation and use of accomplice testimony. *Id.* at 126. *See also McMillen v. United States,* 386 F.2d 29 (1st Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968).

Like *Williamson,* the case at bar is exceptional. Without the guidance of a carefully phrased instruction by the trial court, the jury was ill-equipped to reach a considered and fair verdict as to the guilt of Mario Sandoval. In the unique circumstances of this case, we hold that the failure to caution the jury to scrutinize carefully Marquez's uncorroborated testimony implicating Mario was plain error and necessitates that his conviction be reversed.

Our finding of plain error relative to the conviction of Mario Sandoval does not affect the convictions of either Guillermo Sandoval or Joe Garcia. In each of these cases, the damaging testimony of Marquez was corroborated by other witnesses. As for these two defendants, we have already discussed the major issues in their appeals and found they do not merit reversal. We have also examined the other contentions of these appellants and find them without merit. Accordingly their convictions are affirmed.