UNITED STATES of America, Plaintiff-Appellee,

v.

Richard DiMATTEO, Morris Kessler, James Suggs, Defendants-Appellants.

No. 81–6001.

United States Court of Appeals, Eleventh Circuit.

Oct. 11, 1983.

---

Jay Gregory Horlick, Brooklyn, N.Y., for Kessler.

James R. Suggs, pro se.

Thomas M. Sherouse, Miami, Fla., for Di-Matteo.

Stanley Marcus, U.S. Atty., Miami, Fla., Sara B. Criscitelli, Appellate Sect., Cr. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GODBOLD, Chief Judge, AN-DERSON, Circuit Judge, and GOLDBERG *, Senior Circuit Judge.

GOLDBERG, Senior Circuit Judge:

In this direct appeal from convictions for various offenses flowing out of a conspiracy to import marijuana we are called upon to evaluate two evidentiary rulings. Finding that the trial court improperly admitted extrinsic evidence to attack the credibility of a defense witness, we reverse the convictions of all three appellants and remand.

## I. BACKGROUND

### A. Facts

In early 1980, a DEA informant, Miller, was contacted by appellant Kessler regarding a possible drug smuggling scheme. Af-

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

ter this contact, Miller and DEA agent Martinez met Kessler in Miami at the Fontainebleau Hotel, on April 3, 1980. Kessler described the scheme as involving flying marijuana from Haiti and Columbia to the United States in a DC–6. Kessler wanted agent Martinez to be the pilot. Nothing was settled at that meeting, so another meeting was scheduled the next day.

On April 4, 1980, agent Martinez again met appellant Kessler. Kessler introduced Martinez to appellant DiMatteo and some other conspirators. Bobby Caldevilla was also present for part of that meeting. At this meeting definite plans were made for the importation of marijuana. Subsequently, agent Martinez was introduced to appellant Suggs, who was to participate in unloading the plan when it landed in the United States. Suggs showed agent Martinez the proposed landing site. The marijuana was flown to the United States on April 20, 1980. After the marijuana was unloaded into trucks, DEA agents seized it. Subsequently the conspirators were arrested.

### B. Procedure Below

Some of the conspirators were tried separately, and their convictions have been affirmed by this Court. *United States v. Varella*, 692 F.2d 1352 (11th Cir.1982). Caldevilla was indicted, but after a *James* hearing, *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the trial court ordered that the charges against him be dismissed. Appellants DiMatteo, Kessler, and Suggs were tried before a jury and convicted of various counts flowing out of the conspiracy.

DiMatteo and Kessler tried to show that they had been attempting to establish legitimate business ventures. DiMatteo wanted to introduce testimony by Caldevilla that Caldevilla heard no discussion of marijuana at the April 4 meeting. After extensive voir dire the trial court ruled that if Caldevilla so testified, the government could cross examine Caldevilla regarding subsequent drug related conversations with agent Martinez. The court further ruled that if Caldevilla asserted his fifth amendment rights against self-incrimination, it would allow Martinez to testify regarding the subsequent conversations. Given these rulings by the trial court on the voir dire, DiMatteo decided not to call Caldevilla as a witness. Both Kessler and Suggs joined DiMatteo's objection to the trial court's rulings on these matters.

Kessler attempted to show that his interest was in legitimate business by introducing a recording of a phone call to informant Miller made in the fall of 1980. The government in turn introduced duplicates of other recordings made by informant Miller in which Kessler discussed the drug transaction, rather than a legitimate business deal.

Suggs' court appointed counsel attempted to show that Suggs was not an active participant in the conspiracy. Suggs had a very distinctive raspy voice due to surgery on his larnyx. Suggs' counsel tried to attack Martinez' credibility by showing that Martinez had never noticed Suggs' distinctive voice. During the trial Suggs became unhappy with his court appointed counsel and after trial he requested a new trial because his representation was inadequate. The trial court denied the motion.

### C. Issues on Appeal

We are presented with three issues on this appeal. DiMatteo argues that the trial court's ruling that agent Martinez could testify regarding subsequent drug related conversations with Caldevilla violated the extrinsic evidence rule of Fed.R.Evid. 608(b). Kessler and Suggs join in this argument. Kessler claims that the court improperly admitted duplicate recordings of his telephone conversations with informant Miller. Suggs claims that his counsel did not adequately represent him. We find that the extrinsic evidence claim has merit, but that the duplicate tape claim does not. Because of our disposition of the first argument, we need not address Suggs' inadequate representation claim.

## II. CALDEVILLA'S CHARADE

### A. *Voir Dire*

When DiMatteo's counsel prepared to call Caldevilla to testify, the government apprised the court of the possibility that its cross-examination might cause Caldevilla to assert his fifth amendment right against self-incrimination. In order to avoid prejudicing the jury, the trial court decided to hold a lengthy voir dire of Caldevilla. At the voir dire Caldevilla testified on direct examination that he was present at the April 4 meeting and had heard no mention of marijuana at the meeting.

At that point the government disclosed the fact that on July 7, after the conspiracy involved in this case had terminated, Caldevilla had engaged in discussions with agent Martinez regarding an independent smuggling conspiracy. The district court initially held that the government could not inquire into the subsequent conversation. The court adjourned for the day, and the government put the evening hours to productive use. The next morning the court was persuaded by the government's newfound case law to allow both cross-examination on the July 7 meeting and extrinsic evidence if Caldevilla's answers were not forthright and forthcoming. In order to avoid the prejudice that would result from the cross-examination and extrinsic evidence, DiMatteo chose to forego Caldevilla's testimony.

### B. *Preservation of Error*

DiMatteo and Kessler both urge before us that the trial court's rulings on the subsequent July 7 conversation was error. The government responds, first, that no one can raise the error because none of the disputed testimony was actually given, and, second, that Kessler cannot raise the error because he disavowed Caldevilla as his witness. We treat these arguments in turn.

■ Though we are somewhat troubled by the hypothetical nature of the proceedings in this case, we believe error was amply preserved. The only authority brought to our attention by the parties on this point

clearly holds that error is preserved when evidence is withdrawn following an anticipatory ruling by the trial court. *United States v. Whitehead,* 618 F.2d 523, 528 (4th Cir.1980). The government would have us force DiMatteo to attest to the courage of his convictions by suffering the prejudice of improperly admitted testimony in the faith that an appellate court would later correct the error. Seeing no merit in that position, we follow *Whitehead.* The trial court was clearly apprised of the disagreement with its ruling in the offer of proof, and that is the primary consideration in preservation of error. *See generally,* 21 C. Wright & K. Graham, *Federal Practice and Procedure* §§ 5040, 5041 (1977).

■ It is a bit more difficult to determine whether appellant Kessler preserved any error during the offer of proof. On the first day of the voir dire Kessler's counsel made a point of noting that DiMatteo was calling the witness, not Kessler. Transcript at 438. However, he clearly objected to the government's intention to cross-examine Caldevilla concerning the July 7 meeting: "[I]f this line of questioning is pursued by the Government, Mr. Kessler would be prejudiced by his inclusion in these meetings in July concerning this other criminal activity and I would like to note my objection on his behalf to that taking place." *Id.* On the second day of the voir dire Kessler's counsel noted the benefit to Kessler of Caldevilla's exculpatory testimony, *id.* at 482, and detailed at great length the legal ground for his objection. *Id.* at 482–87. We believe that the trial court was well aware of the disagreement with his ruling, and, thus, Kessler adequately preserved the error for appeal. Finally, we note that Suggs' counsel adopted the objections of DiMatteo and Kessler. *Id.* at 487.

### C. *Extrinsic Evidence and Specific Contradiction*

Ignoring for the moment the hypothetical nature of the proceedings before us, we shall assume the following facts: Caldevilla testified on direct examination that he heard no mention of marijuana at the April

meeting and, when questioned about the July meeting, he asserted his fifth amendment rights against self-incrimination. The government then desired to introduce the testimony of agent Martinez regarding the July meeting. The question facing us is whether that introduction was permissible. Because evidence may be admissible for many purposes, Fed.R.Evid. 105, we shall consider alternative theories of admissibility.

■ **1. Attacking Caldevilla's Credibility.**—The government desired to prove that the April meeting was about marijuana, and Caldevilla testified to the contrary. Thus, the government had a strong incentive to attack Caldevilla's credibility. The government wished to introduce testimony regarding the July meeting to attack Caldevilla's credibility in testifying about the April meeting. That approach, however, runs squarely into Fed.R.Evid. 608(b), which provides: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility . . . may not be proved by extrinsic evidence." This rule is well established in this Circuit. *See, e.g., United States v. Cluck,* 544 F.2d 195 (5th Cir.1976). Accordingly, the government could not introduce agent Martinez' testimony in order to attack Caldevilla's credibility.

■ **2. Extrinsic Evidence and Specific Contradiction.**—The government recognizes the shield provided by the plain words of Rule 608(b), and attempts to penetrate that barrier by invocation of the doctrine of specific contradiction. The government argues that Rule 608(b) applies solely to attacks on the overall credibility of the witness and that extrinsic evidence may be admitted to attack specific facts to which the witness testified, notwithstanding Rule 608(b). We believe that this "specific contradiction" rule is not as broad as the government would have us believe and can be stated in simple terms—evidence may be admitted to prove or disprove material facts in a case, even though a previous witness has testified to the contrary. To understand the need for so obvious a rule, we

must first explain a peculiar potential reading of Rule 608(b).

Credibility can be attacked in two basic ways. First, opposing counsel can show a witness to be generally unbelievable; second, counsel can show that some particular testimony of the witness was unbelievable, for example, by introducing controverting testimony. This second proposition makes possible a slightly bizarre reading of Rule 608(b). Suppose a prosecution witness testifies that the defendant committed the crime. If the defendant sought to introduce testimony to the effect that she did not commit the crime, the prosecution could object on the basis of Rule 608(b)—the defendant seeks to introduce extrinsic (exculpatory) evidence to attack the credibility of the prosecution's (inculpatory) testimony.

■ Fed.R.Evid. 105 shows us the way to avoid this absurd result. Evidence inadmissible for one purpose may be admissible for another purpose. In the example just given, the evidence inadmissible for attacking the credibility of the prosecution's witness may, of course, be admissible to show that the defendant did not commit the crime. This rather simple and obvious proposition has been confused by its elevation to the lofty status of the doctrine of specific contradiction. Extrinsic evidence introduced exclusively in order to attack the credibility of a witness is barred by Rule 608(b), but evidence that is admissible for other purposes is still admissible for other purposes even though it may by implication reduce the credibility of another witness. Thus, in *United States v. Opager,* 589 F.2d 799 (5th Cir.1979), we said:

> Similarly, we believe that Rule 608(b) should not stand as a bar to the admission of evidence introduced to contradict, and which the jury might find disproves, a witness' testimony *as to a material issue of the case.*

> The fact that the business records might have the incidental effect of proving Posner a liar does not affect their admissibility as relevant evidence. In countless cases where facts are in dispute, one party may be able overwhelmingly to

disprove the testimony of a prior witness. *To exclude under Rule 608(b) the latter otherwise relevant evidence,* as the government would have us do today, *would completely divorce legal proceedings from the truth seeking process.*

*Id.* at 803 (emphasis added). *See also* J. Wigmore, *Evidence* § 1003, at 961 (J. Chadbourn rev. 1970).[1]

In the case before us, we need not consider whether the evidence would be independently admissible, because the government, in accord with its understanding of the principle of specific contradiction, has never argued that Martinez' testimony was offered for any purpose other than to attack Caldevilla's credibility. *See, e.g.,* Transcript at 435 ("THE COURT: You are, in effect, trying to bring in subsequent similar or extrinsic acts? MR. McMASTER [prosecuting attorney]: Not against the defendant, Judge. Against a witness and it goes to his credibility . . . ."); *id.* at 478 ("I would bring Agent Martinez in to directly impeach his credibility, to prove on the stand that Mr. Caldevilla is a liar."). In fact, the government specifically disavowed any other ground for admission:

> It's the Government's position that [the defendants] thereby open the door for the admission of the evidence impeaching or what the Government submits, at least, is going to be impeaching the witness' testimony.
>
> If it's material, Judge, *it would only come in for that one particular purpose*

and I should be allowed to use whatever evidence I have to show that Mr. Caldevilla is untruthful.

*Id.* at 491 (emphasis added). Though the trial court made passing reference to other grounds for admissibility, *id.* at 494–95, it is clear that the sole ultimate basis for admitting the evidence was to attack Caldevilla's credibility. The trial judge noted that he "would instruct the jury that the testimony with regard to this matter is admitted and limited to the issue of the credibility of the witness and is not addressed to the direct guilt or innocence of any defendant . . . ." *Id.* at 496.

Given the fact that the extrinsic evidence was admitted solely to attack the credibility of the witness, and the fact that Fed.R. Evid. 608(b) specifically prohibits such a use of extrinsic evidence, the trial court's ruling was in error.

### D. Harmless Error

The government next argues that any error in the trial court's ruling would be harmless. The government's position is that if Caldevilla declined to answer questions on cross-examination because of his fifth amendment rights and the government was unable to rebut with extrinsic evidence, the trial court would have been within its discretion in striking Caldevilla's testimony on direct examination. *See, e.g., United States v. Diecidue,* 603 F.2d 535, 552 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980).[2] Thus,

---

1. The government cites two pre-Federal Rules of Evidence cases that it believes illustrate its view of the specific contradiction rule. In fact, as we explained in *United States v. Holman,* 680 F.2d 1340, 1353–54 (11th Cir.1982), the two cases are not quite so broad. *Jackson v. United States,* 311 F.2d 686, 689–90 (5th Cir.1963), held merely that when a criminal defendant presents himself or herself as a law-abiding citizen not likely to have committed a crime, the prosecution may introduce extrinsic evidence of specific bad acts to show lack of good character. "It must be remembered that the defendant himself injected this idea that as a former violator he had now reformed and neither needed, used, or handled narcotics." *Id.* at 689. *United States v. Gonzalez,* 491 F.2d 1202, 1204 (5th Cir.1974), though using unfortunately

loose language, is to the same effect—Gonzalez alleged a blameless past not involving narcotics and the government was allowed to introduce evidence to the contrary. *Gonzalez,* in fact, relied upon *Jackson* for that proposition. This rule is now codified in Fed.R.Evid. 404(a)(1).

2. We do not hold in fact that it would be proper for the trial court to strike Caldevilla's direct testimony under those circumstances. First, "[i]t is generally only where the witness refuses to answer on 'direct' as opposed to 'collateral' matters that his direct testimony must be excised." *Diecidue, supra,* 603 F.2d at 552. *Diecidue* itself held that an attack on credibility was collateral. *Id.* Second, *Diecidue* dealt with a prosecution witness; the calculus may change with a defense witness because of the defendant's right to present a defense. Again,

**1368**

the situation would be the same as it is now—no testimony by Caldevilla, no rebuttal by Martinez.

■ The problem with this argument is that the government claims only that it was within the trial court's *discretion* to strike the testimony. We will not hold the error to be harmless based on an assumption about how the trial court would exercise its discretion. This case involves enough hypothetical scenarios without our adding to the tale. Given that the error is not harmless and that all defendants objected, we must reverse all the convictions and remand for a new trial.

## III. ADMISSION OF DUPLICATE TAPES

Defendant Kessler raises a second evidentiary argument, and because the same problem is likely to arise on retrial, we address the issue briefly. Kessler made several phone calls during the pendency of the conspiracy to informant Miller. Unbeknownst to Kessler, Miller recorded many of those calls and turned the recordings over to DEA agents. The DEA made copies of these recordings and the government introduced the copies into evidence at trial. Kessler objected to the admission of the copies because "[t]hey are not originals and they have not been in custody of the DEA exclusively or in such a manner secured so that we know these are the tapes and they are not the tapes originally made." Transcript at 549.

■ We construe this as raising two grounds for the objection. First, it questions the accuracy of the copies, and second, it objects simply to the introduction of duplicates rather than the originals. "A 'duplicate' is a counterpart produced ... by mechanical or electronic re-recording, ... or by other equivalent techniques which accurately reproduces the original." Fed.R. Evid. 1001(4). Thus, a duplicate must be an accurate reproduction of the original recording. Here Miller testified that the du-

plicates were "exact recordings of conversations that were on the original tapes." Transcript at 547. Thus, the government properly established that the tapes introduced were duplicates of the original recordings.

■ Under the Federal Rules of Evidence, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed.R. Evid. 1003. The burden of raising an issue as to the authenticity of the original is on the party opposing admission. *United States v. Georgalis,* 631 F.2d 1199, 1205 (5th Cir.1980). We do not believe that Kessler ever met his burden of raising a genuine issue as to the authenticity of the originals. Furthermore, even if he had done so, Miller's testimony that the duplicates accurately reproduced the conversations would have been a sufficient response. "If there is independent evidence of the accuracy of tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward." *United States v. Biggins,* 551 F.2d 64, 67 (5th Cir.1977). Accordingly, we find no error in the admission of the duplicate tapes.

## CONCLUSION

The district court and the government, fully recognizing the possible consequences of error, were in agreement that the government could introduce extrinsic evidence to attack the credibility of the proffered testimony of a defense witness. That is precisely what Fed.R.Evid. 608(b) prohibits, unless there are independent grounds for admitting the extrinsic evidence. Accordingly, we must reverse the convictions

we do not pass on the issue one way or the other, but merely note that it is not a foregone

conclusion that striking Caldevilla's testimony would be permissible.

of all three defendants and remand for a new trial.[3]

REVERSED and REMANDED.

---

**3.** Appellant Suggs also requested a new trial on the ground that his court-appointed counsel was inadequate. Because we reverse on other grounds, we need not address that argument.