UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward G. ACKAL, Henry L. Smith and
C.E. "Ed" Thompson,
Defendants-Appellants.

No. 82–3243.

United States Court of Appeals,
Fifth Circuit.

May 23, 1983.

Rehearings and Rehearing En Banc
Denied July 18, 1983.

William H. Jeffress, Jr., Washington, D.C., for Ackal.

James Boren, Baton Rouge, La., for Smith.

Lewis O. Unglesby, Baton Rouge, La., for Thompson.

Stanford O. Bardwell, Jr., U.S. Atty., James Stanley Lemelle, Asst. U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before GEE, GARZA and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

On July 30, 1981, the defendants, Edward Ackal, Ed Thompson and Henry Smith, were charged in a ten-count indictment with violations of 18 U.S.C. §§ 371, 372, 1341, 1342, 1343, 1951 and 1952. Count 9 of the indictment, charging violations of 1951 and 1952, was severed prior to trial. The remaining counts were tried before a jury, and the jury returned guilty verdicts against all defendants on all counts.

Two of the defendants claim the evidence was not sufficient to support the jury's verdict. A thorough examination of the facts is, therefore, warranted.

An understanding of the identity of the various agencies, companies and individuals is essential to a comprehension of the scheme perpetuated by the defendants.

The United States Department of Health, Education and Welfare (hereinafter HEW) was responsible for administering provisions of the Education of the Handicapped Act, under which HEW would provide funds to various State Departments of Education to further the purpose of the Act. When the Department of Education suc-

ceeded HEW, the Department of Education took over the administration of the Act.

The Louisiana State Department of Education (hereinafter LSDE) was a department of the State of Louisiana, charged with the administration and disbursement of funds received pursuant to the Education of the Handicapped Act.

The State Board of Elementary and Secondary Education (hereinafter BESE Board) was empowered to supervise and control the public elementary and secondary schools of the State and had final budgetary responsibility for all funds appropriated or allocated.

J. Kelly Nix was the Superintendent of Education in Louisiana. Defendant, Ed Thompson, was employed by LSDE as the Deputy Superintendent of Education and was responsible only to the Superintendent of Education.

Defendant, Henry L. Smith, was the Assistant Superintendent of Education for Special Education Services. He was responsible for properly administering state and federal special education programs and for properly expending state and federal funds within the budgetary controls.

Educational Products Corporation (hereinafter EPC) was a Louisiana corporation engaged in the business of selling educational products and services and representing various vendors of educational supplies and services in the state. The defendant, Edward G. Ackal, was the owner and incorporator of EPC.

International Management Systems, Inc. (hereinafter IMS) was a Missouri Corporation licensed to do business in Louisiana. IMS was attempting to market a screening test to the State of Louisiana.

Harold J. Kunzelman was president and part owner of IMS.

Doctor Carl Koenig was the part owner and an employee of IMS.

Wayne Spence had a continuing arrangement with IMS, whereby he would receive ten percent of the profits earned by IMS as a finder's fee commission for leads and contacts that resulted in a contract for IMS.

The first relevant contact between the parties in this case was in May 1978, at a national convention when Kunzelman demonstrated IMS's screening test to Smith. During the summer of 1978 Kunzelman traveled to Baton Rouge to demonstrate the test to Smith's staff. On October 16, 1978, at a reception at a convention in New Orleans, Smith told Kunzelman that he was trying to arrange a meeting between Kunzelman and Thompson and that he would be in touch. On October 17, 1978, while the convention guests were loading a bus for a tour, Smith took Kunzelman aside and told him the meeting with Thompson was set for the next morning at ten o'clock. Furthermore, Smith said, "He wants to talk to you about the screening and don't forget to mention the kitty."

On October 18, 1978, Kunzelman, Koenig and Spence went to Baton Rouge to meet with Thompson. The content, administration and results of the screening test were discussed. Towards the end of the meeting, Kunzelman stated that they had been around state offices before and knew that there had to be cooperation, but they needed direction. Thompson responded, "That is important to know; it makes a difference." Thompson then requested a list of screening firms that could contribute to making a bid process and informed them he would be in touch.

On November 21, 1978, Koenig, Kunzelman and Spence, at the invitation of Thompson, attended a meeting where screening was discussed at LSDE chaired by Thompson. After the meeting, Koenig, Kunzelman and Spence had lunch with Smith, and the amount of money the legislature was going to make available for screening was discussed.

On August 19, 1979, Kunzelman received a telephone call from Smith. Smith stated there would be a $700,000 contract for the screening of 45,000 children. Smith then asked, "What is in the kitty?" Kunzelman replied, "Ten percent." About ten minutes later, Smith called Kunzelman back. Smith inquired, "Could that be fifteen percent."

Kunzelman responded, "Fifteen percent of the profits," and Smith said, "No, of the total." Kunzelman stated that he was not sure and that he would have to get back with Smith.

A few days later Ackal called Kunzelman and said he understood IMS was thinking about trying to do screening in Louisiana and that they should get together "about how that was going to happen." Ackal and Kunzelman agreed to meet at the Hyatt Hotel in Washington, D.C. the next week.

Since Kunzelman had never heard of Ackal, he contacted Smith and asked Smith if he should meet with Ackal. At Kunzelman's request Smith described Ackal's physical appearance, and then Smith said, "You won't miss him."

As previously arranged, Kunzelman went to the bar at the Hyatt Hotel in Washington at 3 p.m. To his surprise Kunzelman saw Thompson with another man. Kunzelman walked over to Thompson, said hello, shook hands and Thompson said, "This is Eddie Ackal, Mr. Direction." Thompson told Kunzelman that he was in Washington to make sure he (Kunzelman) met Mr. Ackal and to visit someone at the capitol. Kunzelman told Thompson he was confused because he thought Ackal was from the Louisiana Educational Association. Ackal treated this as a joke and said that was just the term used. After a drink Ackal suggested that he and Kunzelman meet in Ackal's room.

Before they got on the elevator, Ackal told Kunzelman, "There is not going to be any talk about ten or fifteen percent; it is going to be a lot more than that, and it is not even worth going upstairs if we are going to be talking ten or fifteen percent." Kunzelman informed Ackal that if they were going to screen 45,000 students for $700,000 the figure could not be any higher. Ackal stated he wanted a $350,000 cash payment, and Kunzelman replied that labor costs prohibited such a figure. When Kunzelman asked Ackal what would happen to the $350,000, Ackal replied that he would not give an answer because he did not want Kunzelman to know in case someone asked.

Ackal said he would see what he could do about the labor costs and called Smith. Kunzelman then talked to Smith about labor costs and alternatives, but nothing was resolved. Ackal then told Kunzelman that payments would be made through EPC which would function as IMS's agent.

Ackal and Kunzelman then returned to the bar to meet with Thompson. The three men toasted to everything being all right, and .Thompson said that if everything worked out and if IMS did a good job they were talking about a three to five year relationship.

After a phone call from Ackal, a second Washington meeting was arranged for September 12, this one being among Ackal, Kunzelman and Koenig. At the meeting, Ackal handed Kunzelman a bid proposal for the screening contract which was in a LSDE envelope. The bid proposal was for the screening of 45,000 children but did not specify a dollar figure. Ackal repeated his request for $350,000, but Koenig said that the labor costs prohibited such a figure. Ackal then modified his demands and asked for $150,000 in cash. Koenig said that they wanted to write checks so that they could have "a trail of what was going on." Ackal suggested a "washing" process whereby money would be paid to a third party. The third party would pay taxes on the money, keep some for himself and return the majority which could then be used to make up the $150,000. Finally, the parties discussed a billing system, and the meeting dispersed.

On September 20, 1979, Smith submitted a description of the screening project, calling for the screening of 44,361 children at a cost of $889,620 to the BESE Board's Finance Committee. The proposal was approved by the committee, and on September 27, 1979, the BESE Board approved the letting of contracts for the screening program as presented to the committee. Also on September 27, Smith gave LSDE employees instructions to process the contract on a sole-source basis, thereby eliminating the bid requirement.

Ackal and Kunzelman again met in Washington on October 10, 1979. Ackal

informed Kunzelman that it was now a "whole new ball game." He told Kunzelman that the contract now called for the screening of only 30,000 students for $889,-000. Ackal also indicated that the contract could be ready by October 20, 1979.

On October 11, 1979, Kunzelman sent a contract proposal to the LSDE to screen 30,000 children for $889,506. Kunzelman believed, as a result of prior conversations with Ackal, that the proposal would be accepted.

Later in October LSDE decided the contract could not be handled on a sole-source basis and preparations were made to solicit bids. In a telephone conversation in late October, Smith informed IMS that the contract could not be awarded on a sole-source basis and that the contract was up in the air.

In early November Kunzelman and Koenig met with Smith at a convention at the Lake of the Ozarks. The parties discussed the uncertain status of the contract. At the request of Smith, Kunzelman and Koenig explained to Smith how "the kitty" would be paid to Ackal. Kunzelman explained that Ackal would act as IMS's agent, that money and invoices would be passed back and forth based on exorbitant prices and somehow the money would get back into the political circle.

On December 12, 1979, Koenig and Ackal met in Washington to discuss the contract. Ackal told Koenig to enter a bid of $889,-000. Ackal assured Koenig that a lower bid was not necessary. At this meeting Koenig and Ackal agreed that the payment would be $360,000. Ackal told Koenig that IMS would not be awarded the contract unless the $360,000 payment was made. As a result of the impressions given by Thompson and Smith, Koenig believed Ackal's statement was accurate.

After Smith had reviewed the request for bids, it was sent from LSDE to potential bidders. Six firms, including IMS, respond-ed with letters of intent to bid. IMS, however, was the only company that ultimately submitted a bid. IMS's bid was submitted on January 9, 1980, for $889,000.[1]

IMS's bid was approved by Smith despite the fact that his chief accountant and administrative specialist for the budget recommended against the acceptance. On January 23, 1980, Smith presented the screening contract to the Board's Finance Committee. Even though the present proposal called for the screening of 30,000 children while the proposal before the committee in September called for the screening of 45,000 children, Smith indicated to the committee that he simply wanted them to approve what they had approved in September. The committee subsequently approved the contract.

The contract required IMS to post a $150,000 performance bond, and IMS could not receive its first payment under the contract until $150,000 was deposited with LSDE. After extensive efforts, IMS was unable to find a company that would give them a performance bond. On January 23, 1980, Kunzelman met with Ackal in Baton Rouge to discuss the problem. Kunzelman informed Ackal that if IMS could not secure a performance bond, a cash bond would have to be posted and part of Ackal's first payment would have to be withheld by IMS to accomplish this. Ackal became angry, said he was tired of dealing with people like Kunzelman and barged out of the room. After reporting the incident to Koenig, Kunzelman received a phone call from Smith and Thompson. Smith indicated that he knew there had been an argument with Ackal, and Thompson asked if it would help if IMS received half of the total amount of the contract as the first payment instead of the one-third originally agreed on. Kunzelman was concerned that altering the payment schedule could cause cash flow problems later in the contract, and he asked if the second half of the payment could be

1. Kunzelman testified that on the contract proposal calling for the screening of 45,000 children, IMS would have bid $600,000 had it not been for the payment to Ackal. The state, therefore, could have had 15,000 more students screened for $289,000 less had IMS not been instructed by Thompson and Smith to operate through Ackal.

spread out. Smith responded that the subject could be discussed at a later time. Kunzelman then accepted Thompson's proposal.

A short time later Ackal called Kunzelman, indicated he knew things were worked out and apologized for his behavior.

On January 24, 1980, the BESE Board was scheduled to meet to consider the contract. That morning Smith and Kunzelman met for breakfast, and they were to meet Mrs. Reed, who was a BESE Board member. While she was approaching the table, Smith said to Kunzelman, "I need twenty-five thou." Kunzelman told Smith to talk to Spence.[2] Later that day the entire BESE Board concurred with Smith's recommendation and approved the screening contract.[3]

Since IMS had deposited $45,000 with LSDE as a bid bond, it needed to deposit an additional $105,000 to meet the $150,000 bond requirement. Since IMS would be paid one-half of the contract price upon posting the $150,000, the $105,000 was only needed for one day. Having been unable to obtain a loan from traditional sources, Kunzelman approached Ackal. Ackal eventually agreed to loan IMS $105,000 for four days for $7,500. Ackal gave Kunzelman a check for $105,000; Kunzelman deposited the check with LSDE; LSDE gave IMS a check for $445,000 as the first payment on the contract. On February 4, 1980, Kunzelman then gave Ackal a check for $285,000—$180,000 payment to Ackal and $105,000 for repayment of the loan. Kunzelman also gave Ackal seventy-five $100 bills to cover the interest.

During the same time period—late January, early February 1980—Spence met with Smith in Baton Rouge. Smith told Spence that he would like to see something come out of the screening program for himself.

Spence replied that it was not his area of involvement, but that he would pass that word on to Kunzelman or Koenig. Subsequently, Spence did talk to Koenig. It was agreed that the payments would be made to Smith, and this would be done through Spence. IMS decided to pay Smith $5,000 immediately and $20,000 when the contract was completed. On February 25, 1980, IMS gave Spence a check for $7,143—$5,000 to give to Smith and the remainder to pay Spence's income tax on the entire $7,143.

On April 7, 1980, Kunzelman informed Smith that IMS was having cash flow problems, and he asked Smith to make the last one-half payment in two payments of one-fourth each. Smith agreed to the change, authorized the change and on May 1, 1980, LSDE issued a $222,250 check to IMS. In turn on May 2, 1980, Kunzelman issued a $90,000 check to EPC.

On July 10, 1980, Smith telephoned Kunzelman on his speaker phone and told Kunzelman Thompson was with him. Smith asked, "If everything is like it was last year, the contract is exactly the same, how much would there be for the kitty?" Kunzelman told Ackal that he would work on it and get back with him. The next day Smith called Kunzelman and asked how much would be in "the kitty," if everything was the same as last year, and if he [Smith] and Thompson would deal directly with IMS. The following day Koenig called Smith and told him that if everything were the same and they dealt directly with them there would be $110,000 in "the kitty." Smith replied, "O'kay, I will get back with you."

Around August 1, 1980, at Smith's request, Kunzelman and Koenig met Smith and Thompson at a conference in New Orleans. Smith said he understood that if they dealt directly with Kunzelman and

**2.** Smith's request for $25,000 became the subject of count 9 of the indictment, which was severed before trial. The appropriateness of the district court's admission of this evidence will be addressed herein.

**3.** Mr. F.A. Davis, the BESE Board member who moved for acceptance of Smith's request, testified that had he known the number of students to be screened had been reduced to 30,000 he would have made inquiries. He also testified that he would not have voted to approve the contract had he known Ackal was to receive $360,000.

Koenig, and if Ackal was cut out, there would be $120,000 green stuff on the table. Smith then asked how much Ackal was paid, and Koenig told him $360,000. Smith replied, "Gee, that is a lot," and Thompson said, "He must be in a very high tax bracket." Smith asked if there would be more money in "the kitty" if the contract was for screening a certain number of students and a lesser number were actually screened. Kunzelman and Koenig, however, rejected this idea. The meeting concluded with Thompson indicating that he would try to get the screening contract on the minutes of the August BESE Board meeting so that funding would not lapse.

At Smith's request, on a Saturday morning in early August, Smith and Kunzelman met for coffee. Smith told Kunzelman that Ackal was out, that $120,000 was o'kay and that Nix wanted a third up-front. Kunzelman replied that it was impossible to pay one-third up-front.

On August 25, 1980, LSDE made the final $222,250 payment to IMS. On August 29, 1979, IMS gave Spence a $28,000 check—$20,000 for Smith and $8,000 to cover Spence's income tax on the entire $28,000. Except for a sum used to buy Smith airline tickets, Spence subsequently returned the $28,000 to IMS.

On September 2, 1980, Kunzelman went to Lafayette to deliver a $90,000 check to Ackal. When Kunzelman arrived, Ackal was upset and informed Kunzelman that he [Ackal] had been told that IMS "was offering $160,000 to the boys and dealing him out." Kunzelman responded that he had nothing to do with it, and Ackal stated that he was not going to be cut out. The parties then discussed the invoices which EPC was to provide IMS. The meeting concluded with Ackal and Kunzelman going to Ackal's office to negotiate an invoice.

Several days later Smith called Kunzelman and said that everything would be like it was last year; Ackal will be the person IMS deals with in the State of Louisiana. On October 21, 1980, Ackal and Kunzelman met to discuss the contract for the following year.

The standard for appellate review of criminal convictions for sufficiency of the evidence is well established. The reviewing court

must view the evidence, direct or circumstantial, in the light most favorable to the government and must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. The standard of review is whether a jury could reasonably find that the evidence is inconsistent with every reasonable hypothesis of innocence or, put another way, whether a reasonably-minded jury must necessarily entertain a reasonable doubt of the defendant's guilt.

*United States v. Bethea,* 672 F.2d 407, 411 (5th Cir.1982), *quoting United States v. Marx,* 635 F.2d 436, 438 (5th Cir.1981). This case presents a unique blend of facts where each specific situation must be looked at in light of the entire scheme to truly comprehend the implication or intent of the conspirators in making a statement or in carrying out an action. Looking at the evidence in the light most favorable to the government, a reasonable jury could find that it establishes guilt beyond a reasonable doubt. No more is required. *U.S. v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc).

Ackal makes two points concerning the sufficiency of the evidence. Ackal first contends there was no evidence to support the allegation that there was a conspiracy to defraud the government. He specifically argues that the government did not prove any false representations by any of the defendants. The record, however, reflects that Smith indicated to the BESE Board that they were approving the same contract in January 1980 as they approved in September 1979. In reality, the January 1980 contract called for the screening of 15,000 less children. Ackal's contention, consequently, is without merit.

Ackal next points out that in a mail fraud case, where the theory of fraud is that the government was deprived of the honest and faithful service of one of its employees, the evidence must show the pub-

lic official used his public position to enhance his private position. *United States v. Dixon,* 536 F.2d 1388, 1400 (2d Cir.1976). Ackal argues that since the evidence failed to directly link the money to Smith and Thompson there was no showing that the public officials used their public position to enhance their private position. We disagree. The evidence failed to show the exact nature of the gain Thompson and Smith received. The evidence, however, showed that Smith and Thompson acting in accord with Ackal extracted a $360,000 bribe from IMS. It was not necessary for the government to prove that Smith and Thompson received a portion of the $360,000. It is enough that Smith and Thompson knowingly caused the bribe to be made to Ackal. It may not have been enough if the government had merely shown that Ackal had received a large payment and that the state received less for its money than it should have. Here, however, the evidence showed much more. Here Thompson and Smith solicited the bribe, they indicated who was to receive the bribe, they took action to facilitate payment of the bribe, they showed knowledge that the bribe had been paid, and they acted deceptively to assist the payer of the bribe. Ackal's argument that this was not a bribe but merely a payment to an agent for services rendered to IMS is inconsistent with the facts. An agent is defined as "a person authorized by another to act for him." *Black's Law Dictionary* 59 (rev. 5th ed. 1979). Ackal was in no way acting for IMS; Ackal was acting for himself and for Smith and Thompson in a scheme to defraud the state. The evidence, therefore, showed that Smith and Thompson used their public positions for private gain, and Ackal's contention is without merit.

■ Thompson also contends the evidence was not sufficient to sustain his conviction. Thompson argues that he did not facilitate or advance the conspiracy. It may be true, as Thompson contends, that Thompson was not needed by Ackal and Smith to carry out the conspiracy; needed or not, however, the evidence established that Thompson did participate in the conspiracy. The evidence implicating Thompson is substantial: (1) Smith told Kunzelman to mention the kitty to Thompson; (2) when Kunzelman mentioned his willingness to cooperate (from the context of the conversation obviously offering some form of bribe) and asked for direction, Thompson in no way resisted the offer and, in fact, said "that is good to know"; (3) Thompson introduced Ackal to Kunzelman as "Mr. Direction" indicating from the context that Ackal would show IMS how to pay the bribe; (4) when IMS was having problems paying the kitty to Ackal, Thompson offered to adjust the payment schedule to give Kunzelman one-half the contract price in order to facilitate the payment of the kitty; (5) with Thompson present Smith asked Kunzelman how much would be in the kitty in 1981; and (6) Smith, Thompson, Koenig and Kunzelman discussed the 1981 contract, the kitty for the 1981 contract, dealing directly, cutting Ackal out, and the kitty paid on the 1980 contract. The evidence, therefore, is sufficient to sustain Thompson's conviction.

■ Thompson next argues that the district court erred in permitting the statements of Ackal and Smith to be used against Thompson in violation of *United States v. James,* 590 F.2d 575 (5th Cir.1979).

> Under our holding in *United States v. James,* 590 F.2d 575, 582 (5th Cir.1979), conspiratorial declarations are admissible when it has been "shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy and (3) that the statement was made during the course and in furtherance of the conspiracy."

*United States v. Means,* 695 F.2d 811, 818 (5th Cir.1983). Thompson argues the statements were inadmissible here because it was not shown by a preponderance of the evidence, independent of the statements themselves, that Thompson was a member of the conspiracy.

A finding of independent evidence by the district court will not be overturned on appeal unless clearly erroneous. *United States v. Cochran,* 697 F.2d 600, 603 (5th Cir.1983). The independent evidence established: (1) when Thompson was first offered a bribe, he reacted positively; (2) Thompson introduced Ackal to Kunzelman as "Mr. Direction"; (3) when IMS was having problems paying the kitty to Ackal, Thompson offered to adjust the payment schedule to assist in the payment of the kitty; and (4) Thompson participated in a conversation with Koenig, Kunzelman and Smith in which Koenig and Kunzelman made statements supporting the finding of a conspiracy and in which Thompson made statements indicating a spirit of cooperation. Ample independent evidence exists to support the district court's finding; and the finding, therefore, was not clearly erroneous.

■ All three defendants assert that the trial court erred in admitting the count 9 evidence—evidence that Smith independently extorted $25,000 from IMS. The evidence was clearly admissible as to Smith.

> The test set forth by this court in *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), for determining the admissibility of extrinsic offenses raises two questions: (1) Whether the evidence is relevant to an issue other than the defendant's character; and (2) Whether the evidence possesses probative value that is not substantially outweighed by its undue prejudice. *United States v. Terebecki,* 692 F.2d 1345, 1348 (11th Cir.1982). This test takes an inclusionary and not an exclusionary approach. Case Comment, Federal Rules of Evidence *Rule 404(b) Limits the Admission of Other Crimes Evidence, Under an Inclusionary Approach to Cases Where It Is Relevant to an Issue in Dispute:* United States v. Manafzadeh, 55 Notre Dame Law. 574, 579 (1980). *See United States v. Terebecki, supra,* at 1349 n. 7.

*United States v. King,* 703 F.2d 119, 125 (5th Cir.1983). The count 9 evidence is rele-

vant to an issue other than the defendant's character. Smith's defense in the case was that as far as Smith was concerned this was a legitimate business deal. The evidence, consequently, was relevant to the issue of Smith's intent to commit fraud. Furthermore, after reviewing the record as a whole, it is evident that the probative value of the evidence was not substantially outweighed by any prejudicial effect it may have had. The district court, therefore, did not err in admitting the count 9 evidence as to Smith.

■ Thompson and Ackal argue that although the count 9 evidence may have been admissible against Smith, its admission in a joint trial was unfairly prejudicial as to them. They, therefore, argue that the district court erred in admitting the count 9 evidence in a joint trial and in refusing to sever Smith from the other defendants for separate trial.

> Generally, when similar act evidence is admitted in a multiple defendant trial, it is clear that the co-defendant claiming prejudice could not have been involved in the similar offense. In those circumstances, there is little doubt that a cautionary instruction is sufficient to preserve the co-defendant's right to a fair trial. *See, e.g., United States v. Payden,* 536 F.2d 541, 543 (2d Cir.1976); *see generally, United States v. Papadakis,* 510 F.2d 287, 295 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. De Sapio* [435 F.2d 272 (2nd Cir.1970)], *supra,* at 280.

*United States v. Rosenwasser,* 550 F.2d 806, 808 (2d Cir.1977). This is such a case. In reviewing the record, it is evident that Thompson and Ackal were not involved in the count 9 offense. When Smith solicited the money from both Kunzelman and Spence, he specifically requested the money for himself. Ackal argues that references to him in several tape-recorded conversations between Smith and Spence indicated he was involved in the count 9 offense. These references to Ackal, however, were plainly in regard to the $360,000 payment IMS made to Ackal. It is unreasonable to assume the jury would confuse these refer-

ences with Smith's involvement in the count 9 offense. Since the evidence showed Thompson and Ackal were not involved in the count 9 offense, the trial court's painstaking cautionary instructions were sufficient to preserve Ackal and Thompson's right to a fair trial.[4]

 Ackal next argues that the trial court denied him of his right to cross-examination and thereby deprived him of a fair trial. He specifically complains of two incidents where the trial court warned counsel that if he continued, the door would be opened on the count 9 evidence, and the court would reinstruct the jury to consider the count 9 evidence against Ackal. The first warning came when Ackal's counsel attempted to cross-examine Kunzelman on the $7,143 check given to Spence. The second caution came when Ackal's counsel, while cross-examining Spence, made reference to the tape-recorded conversation between Smith and Spence. This is the tape recording which was presented to establish the extrinsic offense against Smith and which also made reference to Ackal receiving the $360,000 in payments. After reviewing these warnings in the context of the cross-examination questions and the entirety of the conversations between the district court and counsel, the exact scope of the court's warning remains unclear. It is apparent the trial judge was cautioning Ackal's counsel that he could not delve into the count 9 evidence without opening the door for its use against his client; it is not clear whether the trial court was making the same warning as to cross-examination concerning references in the recorded conversation to the $360,000 payment to Ackal.

In any event, we find no reversible error in the court's actions. The extent of cross-examination is within the sound discretion of the district court. *United States v. Renton,* 700 F.2d 154, 159 (5th Cir.1983). The

trial court's "decision will not be disturbed on review unless an abuse of discretion is present." *United States v. Ramirez,* 622 F.2d 898, 899 (5th Cir.1980).

 Ackal presents three points which it claims counsel should have been allowed to probe on cross-examination. First, he asserts counsel should have been allowed to impeach Spence by showing he obtained immunity from prosecution in exchange for testifying against Ackal. Since the jury was informed of the immunity granted to Koenig, Kunzelman and Spence, any limitation of cross-examination in this regard was not prejudicial. Second, Ackal contends counsel should have been allowed to emphasize Ackal's lack of involvement in the count 9 offense. Since the evidence was clear on this point and the district court plainly pointed this out to the jury, Ackal was not prejudiced by the limitation. This line of cross-examination would only have confused the jury and was properly excluded by the district court. Third, Ackal argues counsel should have been allowed to rebut inferences, in the taped conversations, that Ackal's actions, in receiving the $360,000, were not legitimate. As noted earlier, we are not convinced the trial court did in fact limit this line of questioning. Assuming, however, the district court did prevent this cross-examination, in light of the extensive evidence presented on this matter, Ackal was not prejudiced. The trial court, therefore, did not abuse its discretion in limiting the cross-examination.

 The defendants raise four additional points on appeal.

1. Smith contends the investigation, pretrial proceedings and trial were not fair.

2. Smith and Thompson contend the district court erred in denying their request for attorney conducted voir dire and for change of venue.

---

4. Thompson and Ackal assert that the mere fact that the district court gave eighteen cautionary instructions demonstrates prejudice. We disagree. The district court went to great lengths to carefully word the instructions so as to remove any prejudice from Thompson and Ackal; the instructions did not compound the prejudice. Furthermore, we note that in *United States v. Wolford,* 614 F.2d 516, 518 (5th Cir.1980), this court upheld a conviction where twenty-seven cautionary instructions were given to protect the defendant from the prejudice of evidence admitted against a co-defendant.

3. Thompson contends the district court erred in refusing to permit him to present to the jury a written response to the indictment.

4. Ackal contends the district court erred in allowing witnesses to testify to their impressions and opinions.

After thoroughly reviewing the record and the applicable law, we find these contentions to be totally without merit.

Consequently, finding no reversible error, the judgment of the district court is affirmed.

AFFIRMED.