823 F.2d 553
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leon LAWSON, Defendant-Appellant.
 No. 86-1871.
 United States Court of Appeals, Sixth Circuit.
 July 17, 1987.
 
 Before KENNEDY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Leon Lawson appeals from his jury convictions for extortionate lending and collecting in violation of 18 U.S.C. Secs. 892 and 894. Lawson argues that the district court erred by refusing to grant acquittal on two conspiracy charges, and by limiting testimony concerning a government witness' prior use of a knife.
 
 I.
 
 2
 Lawson was charged in a six-count indictment on March 14, 1986. In Count I, Lawson was charged with conspiracy to make extortionate extensions of credit in violation of 18 U.S.C. Sec. 892.[1] In Count II, Lawson was charged with conspiracy to use extortionate means to collect an extension of credit and to punish any person for the nonpayment thereof in violation of 18 U.S.C. Sec. 894.[2] Counts III, V and VI contained the substantive charges of making extortionate extensions of credit in violation of 18 U.S.C. Sec. 892(a). Count IV contained the substantive charge of collecting extensions of credit by extortionate means in violation of 18 U.S.C. Sec. 894(a).
 
 
 3
 Lawson's jury trial began on June 3, 1986 and lasted through June 6, 1986. The government's position was that Lawson, who was a former Golden Gloves boxer, ran a loan sharking operation and was assisted in the operation primarily by Joseph Head, another former boxer, and several other people including Tyrone Lyn, Robert Boynton, James Parker and Pete Johnson.
 
 
 4
 The government's chief witness was Joseph Head. Head had known Lawson, also known as "Bumper," for approximately 20 years, and first saw Lawson loaning money in 1973 or 1974. He knew that Lawson was charging interest, but he did not know how much. Head was often present at Lawson's house when Lawson loaned money and when people returned to repay Lawson. Head named several other friends of Lawson who also often witnessed transactions at Lawson's house, namely Tyrone Lyn, James Parker, Pete Johnson and Robert Boynton. According to Head, Lyn, Parker and Boynton were also former boxers.
 
 
 5
 Head further testified that Lawson kept a record of all loans in a green book, which looked like a diary. Head had looked through the book before, and had seen names and figures.
 
 
 6
 From 1974 through 1985, Head accompanied Lawson approximately 500 times when he went out to collect on loans. According to Head, he and Lawson at times were together five or six days a week. When Head was with Lawson, he would primarily "just sit in the van," but he would protect Lawson if he had to. Head carried a gun on two or three occasions. Lyn, Parker and Boynton also occasionally accompanied Lawson on collections. Lawson loaned Head and the others who helped him money without charging them interest.
 
 
 7
 Head also testified concerning Lawson's practice of loaning and collecting money at the General Motors Plant on Van Slyke Road. When workers at the plant were paid, Lawson would be waiting outside the plant to make and collect on loans. He sometimes would cash the employees' paychecks or, if he missed someone, he tried to meet them at a nearby store which cashed paychecks.
 
 
 8
 Finally, Head discussed how he had known Lawson to "put the squeeze" on people late in paying. He related an incident involving Greg Spottsville, where Spottsville shot Lawson after a disagreement over the sale of Spottsville's watch. Several days after the shooting incident, Lawson picked up Head and Lyn in his van and went looking for Spottsville to kill him. Lawson and the others had guns.
 
 
 9
 Another government witness was K. C. McQueen. McQueen met Lawson at the Van Slyke plant where they both worked. He knew Lawson as a loan shark and described how Lawson would loan and collect money outside the plant. McQueen specifically testified about the various times he borrowed money from Lawson. He stated that the rate of interest was always twenty-five cents on the dollar per week. McQueen knew that Lawson would hit people if they did not pay back their loans and he knew a few people who had been hit by Lawson.
 
 
 10
 McQueen also described an incident which occurred between himself and Lawson on May 10, 1985. McQueen was talking with Lawson on Zachary Street when Lawson claimed that McQueen owed him $20. McQueen refused to pay. According to McQueen, Lawson then struck him twice with his fist in the mouth and eye, before he was stopped by a male and female police officer. McQueen received stitches in both places. McQueen acknowledged that he had a switchblade in his pocket at the time with a five or six inch blade, but he did not take it out of his pocket nor did he raise his hands to strike Lawson.
 
 
 11
 On cross-examination, McQueen was asked whether he was known for carrying a knife and whether he had "cut" one of his family members. He responded that he always has some knife in his pocket but denied cutting a family member.
 
 
 12
 The male police officer who witnessed the altercation between Lawson and McQueen testified that he saw them arguing in the street and when McQueen tried to walk away, Lawson grabbed him, bounced his head several times off the top of a car, and struck him repeatedly even after McQueen had fallen to the ground. The police officer and his partner stopped Lawson and frisked him but found no weapon. After Lawson claimed that McQueen had a knife or gun, the police officer's partner searched McQueen. The testifying officer did not see McQueen make any threatening actions.
 
 
 13
 The female officer who also witnessed the altercation testified in a similar fashion. She stated that she did not recall finding anything when she searched McQueen.
 
 
 14
 McQueen's wife, Mary, testified as to the injuries her husband sustained. On cross-examination, she stated that her husband was "sometimes" known for carrying a knife. When defense counsel attempted to question Mary whether K.C. had "cut" their son and whether the son had a scar from the incident, the court sustained objections made by the government, thereby disallowing the inquiry.
 
 
 15
 The government also had other "customers" of Lawson testify as to the loans they received, the interest Lawson charged, and Lawson's reputation for threatening or hitting people who did not repay their loans. One woman turned her federal income tax refund check over to Lawson in repayment of her past debts.
 
 
 16
 One of the witnesses called by the defense was Monroe Pergue, who witnessed the altercation between Lawson and McQueen. Pergue testified that he saw the female police officer find McQueen's knife but give it back to him.
 
 
 17
 James Parker, who was with Lawson when the McQueen incident occurred, also testified. He stated that McQueen had put his hand in his pocket before Lawson hit him. When defense counsel asked Parker if McQueen had a reputation for carrying something in his pocket, the court sustained the government's objection.
 
 
 18
 Lawson testified that he hit McQueen because he had reached into his pocket and was "coming out with his knife." Lawson thus claimed that he was acting in self-defense, not with a purpose to intimidate McQueen into paying his loan back.
 
 
 19
 As to the charges of extortionate lending, Lawson admitted loaning money to people, but denied charging high interest rates. He also stated that there was no agreement between him and Head or the others to intimidate people into repaying their debts.
 
 
 20
 At the close of the government's evidence, defense counsel argued a motion for acquittal on the two conspiracy counts, claiming that there was no agreement between anyone to conduct a loan sharking operation. The court denied the motion for acquittal, finding that the evidence created sufficient jury questions.
 
 
 21
 On June 6, 1986, the jury found Lawson guilty on all six counts. Defense counsel again moved for judgment of acquittal on the conspiracy counts on June 17. On September 9, 1986, the district court sentenced Lawson, imposing concurrent terms of three and one-half years imprisonment and fines of $2,500 on each count. On September 19, 1986, the district court entered an order denying the motion for acquittal. This timely appeal was filed that same day.
 
 II.
 
 22
 Lawson first argues that the district court erred in denying his motions for acquittal on the two conspiracy charges. Because Counts I and II are based on two distinct statutory violations, this argument necessitates two inquiries--whether the evidence is sufficient to support a conviction of conspiring to make extortionate extensions of credit (Count I), and whether it is sufficient to support a conviction of conspiring to collect extortionate extensions of credit (Count II). In making either inquiry, our standard of review is highly deferential.
 
 
 23
 In deciding whether evidence is sufficient to withstand a motion for an acquittal, we must view the evidence and all reasonable inferences in the light most favorable to the government. If the evidence is such that a reasonable mind might fairly find guilt beyond a reasonable doubt, the denial of defendant's motion for acquittal must be affirmed.
 
 
 24
 United States v. Holloway, 731 F.2d 378, 381 (6th Cir.) (citation omitted), cert. denied, 469 U.S. 1021 (1984). Thus, only if this court concludes that no reasonable juror could find, based on the evidence of record, guilt under Counts I or II will we find error in the district court's denial of Lawson's acquittal motions.
 
 
 25
 A. Conspiracy to Make Extortionate Extensions of Credit
 
 
 26
 An extortionate extension of credit is defined in 18 U.S.C. Sec. 891(6) as
 
 
 27
 any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.
 
 
 28
 Thus, the crime has essentially two elements: (1) an extension of credit (a loan); and (21 the understanding of the debtor and creditor that force could result from failure to repay the loan. We must determine whether the evidence is such that a reasonable juror could conclude that a joint enterprise or collective venture existed for the purpose of accomplishing this crime. As the government acknowledges, the evidence on this charge is circumstantial, but circumstantial evidence can support a conviction of conspiracy. U.S. v. Adamo, 742 F.2d 927, 932 (6th Cir. 1984), cert. denied, 469 U.S. 1193 (1985). The government contends that the evidence in this case supports the inferences that a conspiracy existed and that Lawson wilfully participated in the conspiracy.
 
 
 29
 We agree with the district court's conclusion that the evidence is sufficient to create a jury question on whether a conspiracy existed to make extortionate loans. There was ample evidence that Joseph Head was repeatedly at Lawson's home when he made loans, and that Head knew Lawson was actively engaged in making and collecting on loans. There was also evidence that other individuals, such as Lyn, Boynton, Parker and Johnson, were often present when loans were made by Lawson. This evidence is susceptible to the reasonable interpretation that these individuals willingly participated in an endeavor "to create an atmosphere of intimidation and fear with respect to the loans made." United States v. Annoreno, 460 F.2d 1303, 1310 (7th Cir.), cert. denied, 409 U.S. 852 (1972). That is, a reasonable 3'uror could find, based on the evidence and its reasonable inferences, that there was a conspiracy to make extortionate extensions of credit. As this court has stated previously,
 
 
 30
 [p]articipation in a conspiracy need not be proved by direct evidence. "[A] common purpose and plan may be inferred from a 'development and collocation of circumstances.' " It is not necessary that there be a formal agreement in order to have an unlawful conspiracy. "Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose"
 
 
 31
 United States v. Luxenberg, 374 F.2d 241, 249-50 (6th Cir. 1967) (citations omitted). With these statements in mind, we affirm the district court's denial of Lawson's motion for acquittal on Count I.
 
 
 32
 B. Conspiracy to Collect Loans by Extortionate Means
 
 
 33
 With regard to Count II, the question is whether the evidence is sufficient for a reasonable juror to find that Lawson was a member of a conspiracy to collect extensions of credit by extortionate means in violation of 18 U.S.C. Sec. 894 (a) . "Extortionate means" is defined as
 
 
 34
 any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.
 
 
 35
 18 U.S.C. Sec. 891 (7) (emphasis added) . Thus, any threat of harm, whether express or implied, is prohibited. United States v. Natale, 526 F.2d 1160, 1168 (2d Cir. 1975), cert. denied, 425 U.S. 950 (1976).
 
 
 36
 There is clearly sufficient evidence for a reasonable juror to have found that a conspiracy existed for the purpose of collecting loans through the implicit threat of violence. Although Head denied membership in any such conspiracy, he testified that he went with Lawson over 500 times on collections and that he would protect Lawson if the need arose. Other individuals also went with Lawson on collections . While there is no direct evidence of an agreement between Lawson and the others, there is sufficient circumstantial evidence to present a jury question of whether there was an implicit agreement that Head and the others would assist Lawson in using force to obtain payment on his loans if necessary. The presence of Head and the other individuals with Lawson when he made his collections also can reasonably support a finding of implicit threat of use of violence. Accordingly, we affirm the district court's denial of Lawson's motion for acquittal on Count II.[3]
 
 III.
 
 37
 Lawson's other claim on appeal is that the district court erroneously limited the testimony concerning K. C. McQueen's past use of a knife. As part of its case, the government presented evidence that Lawson beat McQueen because he refused to repay a loan. Lawson responded to this proof by claiming that he struck McQueen in self-defense after McQueen started to pull a knife out of his pocket. To provide support for Lawson's claim of self-defense, defense counsel at trial elicited an affirmative response from McQueen to the question of whether he had a reputation for carrying a knife. Counsel subsequently asked McQueen's wife whether McQueen had ever used a knife to cut their son. McQueen had denied ever doing so during his testimony. When the government objected, counsel explained that the inquiry was relevant to establishing the reasonableness of Lawson's belief that McQueen had a knife and was also relevant to impeaching McQueen's credibility. The court disallowed defense counsel's inquiry into the alleged incident involving McQueen's son, stating:
 
 
 38
 [t]he whole issue is irrelevant as to whether he's known for carrying a knife .... He [McQueen] admits he had a knife on him at the time. Now the only part that's relevant would be this defendant ,s knowledge of whether he frequently carried a knife....
 
 
 39
 Defense counsel did not ask Lawson whether he knew McQueen's reputation for carrying a knife. .
 
 
 40
 Lawson now contends that the cross-examination inquiry into whether McQueen had cut his son was permissible under Fed. R. Evid. 404(b), as involving a prior wrong used for impeachment purposes. Lawson refers the court to 22 C. Wright & K. Graham, Federal Practice & Procedure, Sec. 5240, 474-75 (1978), which states:
 
 
 41
 Another common law category of permissible use of other crimes that is not listed in 404(b) is impeachment. This does not refer to the use of prior crimes to show that a witness is the sort of person likely to lie under the exception stated in Rule 404(a) (3) nor the Michelson doctrine permitting character witnesses to be asked if they have heard of past derelictions of the accused. Instead, this category includes the use of evidence of prior crimes to rebut the defendant's sweeping assertions of innocence under the the doctrine of specific contradiction or the use of prior crimes to show a motive to testify favorably for the prosecution.
 
 
 42
 (Footnotes omitted). According to Lawson's argument, McQueen had made the sweeping assertion that he had not used a knife against a family member, and the cross-examination of Mary McQueen was intended to impeach that testimony with evidence of a prior action inconsistent with McQueen's assertion.
 
 
 43
 The government argues that Fed. R. Evid. 608(b), which prohibits using extrinsic evidence to prove a specific instance of a witness' conduct for impeachment purposes, is dispositive. See United States v. DiMatteo, 716 F.2d 1361, 1367 (11th Cir. 1983), vacated and remanded on other grounds, 469 U.S. 1101, aff'd, 759 F.2d 831 (1985). Since defense counsel was seeking to introduce extrinsic evidence of McQueen's prior bad act in order to impeach McQueen's testimony, the attempted questioning of McQueen's wife seems to indeed fall within the type of testimony prohibited by Rule 608(b).
 
 
 44
 However, Lawson asserts the proposition that when conflicts arise, Rule 404(b) takes precedent over Rule 608(b). See United States v. Smith Grading & Paving, Inc., 760 F.2d 527 (4th Cir.) (where defendant denied prior misconduct on cross-examination, government was permitted to introduce evidence in rebuttal that defendant engaged in the alleged misconduct which was relevant to proving a material issue in the case), cert. denied, 106 S. Ct. 524 (1985).
 
 
 45
 There are several flaws in Lawson's reliance on Smith Grading. First and foremost is that the evidence admitted under Rule 404 (b) in Smith Grading was primarily relevant to the material issue of the defendant's intent; it was only incidentally relevant for impeachment purposes. The court in Smith Grading emphasized that Rule 608(b) should "not be read so broadly" as to exclude evidence which is "probative of a material issue." Id. at 531. On appeal, Lawson has not explained how any extrinsic evidence concerning a previous incident between McQueen and his son has any relevance to a separate material issue apart from McQueen's credibility.
 
 
 46
 The second problem with Lawson's argument is that he did not argue before the district court that the excluded evidence was admissible under Rule 404(b). While defense counsel did assert impeachment as a ground for admissibility, he did not rely on Rule 404(b) as supporting admission of the evidence. Consequently, the district court was prevented from making the appropriate inquiries under Rule 404 (b), such as whether the evidence was truly offered for a relevant, proper purpose other than to prove bad character, and whether the probative value of the evidence outweighed its prejudicial impact. Under these circumstances, we conclude that Lawson did not satisfy the specificity requirement of Fed. R. Evid. 103(a). Thus, reversal may only be granted upon a showing of plain error, and we are unsatisfied that Lawson has made such a showing in this case.
 
 
 47
 Furthermore, this issue arises from the district court's limitation of defense counsel's cross-examination of McQueen's wife. Decisions as to the extent of cross-examination of a witness are made within the sound discretion of the district court. United States v. Smith, 748 F.2d 1091, 1095 (6th Cir. 1984); United States v. Ackal, 706 F.2d 523, 532 (5th Cir. 1983). Accordingly, decisions limiting the extent of cross-examination may be reversed only upon a showing of abuse of discretion resulting in prejudice to the defendant. United States v. Peyro, 786 F.2d 826, 828 (8th Cir. 1986); Ackal, 706 F.2d at 532.
 
 
 48
 Under the instant circumstances, we detect no abuse of discretion and, even if we did, we are of the opinion that Lawson was not prejudiced by any error in limiting cross-examination of McQueen's wife. There was ample testimony by other loan "customers" of Lawson concerning the interest rate charged and Lawson's reputation for threatening or hitting people who were late in repayment. Although McQueen's testimony was persuasive, it was not the sole evidence supporting the government's case. Accordingly, even if defense counsel had impugned McQueen's credibility by asking his wife whether he had cut his son with a knife, there is other evidence sufficient to support a guilty verdict. It follows that any error by the district court in limiting defense counsel's cross-examination did not prejudice Lawson. Consequently, reversal is not warranted under the circumstances.
 
 
 49
 A related argument raised by Lawson is that the district court committed reversible error when it refused to allow Parker's direct testimony as to McQueen's reputation for carrying something in his pocket. Lawson contends that Parker's testimony was relevant to his claim that he acted in self-defense when he struck McQueen. We discern no grounds for reversal on this argument, since Lawson has not shown how the exclusion of Parker's testimony affected a substantial right of Lawson. See Fed. R. Evid. 103 (a) ; Fed. R. Crim. P. 52 (a) . McQueen and his wife had already acknowledged that he was known for carrying a knife, so testimony by Parker to the same effect would have merely been cumulative. Furthermore, the pertinent issue was whether Lawson knew of McQueen's reputation. Parker's testimony as to his knowledge of McQueen's reputation would have been completely unresponsive to this matter, and defense counsel declined to examine Lawson on the issue, although he was free to do so. As the government aptly summarizes, "[t] he record shows that McQueen admitted he always carried a knife, that Parker's other testimony supported the self-defense theory, and that defendant himself testified why he struck McQueen." Thus, all the evidence relevant to Lawson's defense was before the jury, the jury simply declined to accept it. Under these circumstances, the district court's limitation of Parker's direct testimony does not constitute reversible error.
 
 
 50
 The judgment of the district court is accordingly AFFIRMED.
 
 
 51
 CORNELIA G. KENNEDY, Circuit Judge, concurring in part and dissenting in part.
 
 
 52
 I agree with the majority of the panel that the evidence was sufficient to create a jury question on whether a conspiracy existed to make extortionate loans and to collect extensions of credit by extortionate means. However, I believe that the evidence permits the finding of only one overall conspiracy or agreement with two illegal purposes.[1] The defendant and his coconspirators were engaged in a single loan-sharking operation. The evidence indicates that all of the loans were made at extortionate rates of interest. The conspirators did not separate those loans that would be collected by extortionate means and those that would not. Apparently, when people paid, and many did, no threats were made. A single agreement or scheme to engage in criminal activity does not become two conspiracies because it has as its purpose the commission of two offenses. Braverman v. United States, 317 U.S. 49 (1942).
 
 
 53
 The government may allege a single conspiracy in several counts to meet the uncertainties of the evidence. United States v. McKnight, 253 F.2d 817 (2d Cir. 1958); United States v. Maryland State Licensed Beverage Ass'n, Inc, 240 F.2d 420 (4th Cir. 1957). However, only the single penalty prescribed by the conspiracy statute can be imposed.
 
 
 54
 I would vacate the judgment of conviction as to counts I and II, and remand to the District Court with directions to resentence the defendant to a single sentence as the Court did in Braverman. I concur in the remainder of the majority's opinion.
 
 
 
 [1]
 Section 892(a) states:
 Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
 
 
 [2]
 Section 894(a) states:
 Whoever knowingly participates in any, or conspires to do so, in the use of any extortionate means
 (1) to collect or attempt to collect any extension of credit, or
 (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
 
 
 [3]
 The issue addressed in Judge Kennedy's separate opinion concerning Lawson's conspiracy convictions was not presented to either the district court or to this court. Consequently, we decline to reach it, mindful of our role as an appellate court. See Sigmon Fuel Co. v. Tennessee Valley Authority, 754 F.2d 162, 164-65 (6th Cir. 1985)
 
 
 [1]
 Although counsel for defendant did not raise this specific issue in his brief, he did attack the sufficiency of the evidence to support each of the two counts and did request this relief at oral argument