UNITED STATES of America, Plaintiff,

v.

Sixto Mario ARANGO, Carlos Arturo
Arango and Simeon Rojas–Lopez,
Defendants.

No. 86–246–CR.

United States District Court,
S.D. Florida,
Miami Division.

June 16, 1987.

■■■■■■■■

Michael P. Sullivan, Asst. U.S. Atty., Miami, Fla., for U.S.

Lawrence F. Ruggiero, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

ARONOVITZ, District Judge.

THIS CAUSE is before the Court upon the Defendants' Motions for Vacatur, Dismissal, New Trial and Production of Documentation. In accordance with the procedures set forth in *United States v. Ellsworth,* 814 F.2d 613 (11th Cir.1987), as more fully set forth below, this Court conducted an evidentiary hearing on the matters set forth in Defendants' Motions. For the reasons enunciated below, the Defendants' Motions are hereby DENIED.

## I. PROCEDURAL BACKGROUND

The Defendants were indicted under a five-count indictment, charging a conspiracy to manufacture cocaine, the manufacturing of cocaine at two locations, and the possession of cocaine at the same two locations. On June 16, 1986, the Court conducted a hearing on Defendant Carlos Arturo Arango's Motion to Suppress, which Motion was denied, and on June 17, 18, and 19, 1986, the case proceeded to a jury trial. As a result of that trial, the Defendants were convicted as to all charges. These convictions are the subject of a pending appeal before the United States Circuit Court of Appeals for the Eleventh Circuit.

In March of 1987, during the pendency of the appeal, the United States filed a Motion for Certification of Remand for Further Consideration in this Court and, simultaneously, a Motion for Stay of Briefing Schedule and Motion to Remand in the Eleventh Circuit Court of Appeals, indicating that this Court should determine, post-trial, whether certain information within the constructive knowledge of the government should have been disclosed pre-trial to the Defendants as *Brady/Giglio* [1] material.

Based thereon, the Court scheduled a hearing on May 4, 1987, at which time arguments were heard concerning the proper procedure for this Court to entertain post-trial motions, given the pendency of an appeal, based on newly supplied information which may fall within the category of *Brady* material. The parties were in agreement that the procedure set forth in *United States v. Ellsworth,* 814 F.2d 613 (11th Cir.1987) is controlling, which provides:

> The proper procedure after an appeal is taken is for a motion to be filed with the district court; the district court may either deny the motion on its merits or certify that the motion should be granted in order to afford the appellate court jurisdiction to entertain a motion to remand.

*Id.* at 614, *citing United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984).[2]

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

2. While Fed.R.Crim.P. 33 specifically provides that a motion for new trial may not be granted by a district court while an appeal is pending, several circuits, including this Circuit, have held that the rule does not prohibit the district court from entertaining the motion. *See, e.g., United States v. Fuentez–Lozano,* 580 F.2d 724 (5th Cir. 1978); *United States v. Ellison,* 557 F.2d 128, 132 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct.

504, 54 L.Ed.2d 450 (1977); *Ferina v. United States,* 302 F.2d 95, 107 n. 1 (8th Cir.1962).

Under this procedure, the district court is empowered to deny the motion for new trial, at which point the defendant may consolidate the issues raised in that motion with the issues already pending on appeal. Should the court determine that the motion should be granted, however, the court is empowered only to certify to the appellate court its inclination to grant the motion, at which point the appellate court may entertain a motion for remand. *United States v. Fuentes–Lozano,* 580 F.2d 724, 725–26 (5th Cir. 1978).

After hearing opening statements in the form of a proffer, the Court granted Defendants leave to file whatever post-trial motions they deemed appropriate, which motions are the subject of this Order, and scheduled an evidentiary hearing to determine whether any *Brady* material should have been disclosed to Defendants by the government. Based on the evidentiary hearing held in this cause, at which various Metro–Dade County police officers, Drug Enforcement Agency officers, and Assistant United States Attorneys testified, the Court makes the following findings of fact with respect to the incident which the government has belatedly brought to the attention of defense counsel and which Defendants argue requires a new trial.

## II.  FINDINGS OF FACT

1. In the early morning hours after his arrest on March 16, 1986 at a cocaine manufacturing laboratory located at 7943 N.W. 64 Street, Miami, Florida, Defendant Carlos Arturo Arango was taken by Metro–Dade police officers and DEA agents to the parking area of the Villa Regina Apartments located on Brickell Avenue in Miami, Florida.

2. Carlos Arturo Arango pointed out a vehicle parked in the parking garage of the Villa Regina Apartments, claiming that said vehicle belonged to his boss.

3. The police believed that Carlos Arturo Arango's boss was the money man behind the cocaine manufacturing operation.

4. A check with the apartment security disclosed that the vehicle belonged to Apartment 706.

5. Apartment 706 was leased to Defendant Sixto Mario Arango.

6. The police then proceeded to enter Apartment 706, without a warrant, using keys obtained either from Carlos Arturo Arango's brother, Sixto Mario Arango, at the time of Sixto's arrest the night before, or those seized from Carlos Arturo Arango at the time of his arrest.

7. Present at the time of this warrantless entry were DEA agents Kenneth B. Peterson, Anthony Marratta, and John Andrejko, and Metro–Dade County officers Gerry Stinson, Gail Shaver, and Judy Gable. Agents Peterson and Andrejko were apparently in charge of the entry.

8. A search of the apartment was conducted whereupon a plasticene bag containing approximately two ounces of white powder was discovered on a table in the living room area.

9. The white powder was never field-tested to determine whether it was an illegal controlled substance.

10. Agent Peterson telephoned AUSA William Norris from the apartment for the purpose of inquiring as to whether a search warrant could be obtained for the apartment, at which time Agent Peterson was referred to the Duty AUSA, Richard Scruggs.

11. AUSA Richard Scruggs instructed Agent Peterson to completely vacate the apartment, leaving its contents untouched, and to meet him at his office to discuss whether a search warrant could be obtained.

12. The police then vacated the apartment, leaving agents posted at the apartment complex, while Agents Peterson and Andrejko proceeded to meet with AUSA Richard Sruggs.

13. AUSA Richard Scruggs informed the DEA agents that a search warrant could not be obtained because of a lack of probable cause and advised the agents not to prepare a report of the incident. AUSA Richard Scruggs testified that his reasoning for this instruction was that "he did not want to tie the hands of the handling AUSA" as to how the matter should be handled. He did, however, advise the agents that he would apprise the handling AUSA of the incident.

14. AUSA Scruggs also testified that he did make notes of this meeting with Agents Peterson and Andrejko in his capacity as Duty AUSA, but that these notes could not now be located.

15. Apparently, this file passed through the hands of several United States Attorneys, until it finally landed in the lap of AUSA Thomas A.W. Fitzgerald, who even-

tually tried the case on behalf of the government. None of the handling United States Attorneys were personally made aware of the warrantless entry by AUSA Richard Scruggs.

16. A couple of weeks before trial, AUSA Fitzgerald became aware of the warrantless entry into Defendant Sixto Mario Arango's apartment during the course of his pre-trial interview of agents Angel G. Hernandez and Andrew Perez.

17. Without investigating further, AUSA Fitzgerald dismissed the incident as irrelevant to the trial of Defendants Carlos Arturo Arango, Sixto Mario Arango, and Simeon Rojas–Lopez, and as "too remote in time" to the incidents charged in the indictment herein, even though the arrests of all three Defendants and the warrantless entry occurred within a six-hour period of time.

18. AUSA Fitzgerald testified that he was not at any time prior to trial made aware of the fact that a bag of white powder was observed at the subject apartment.

19. Either while the jury was deliberating or immediately after the trial of this case, DEA Agent Peterson convened a meeting at DEA (Group 4) headquarters, at which various DEA agents and Metro–Dade police officers were present.

20. During the course of this meeting, Agent Peterson admonished those present for leaking information to the United States Attorney's Office regarding alleged wrongdoing at the Villa Regina Apartments.

21. Although AUSA Fitzgerald became more fully aware of the incident in question, including the presence of the plastic bag of white powder and other allegations, after the trial of this case, this matter was not brought to the Court's or defense counsel's attention until concern arose as to how it might impact on the pending appeal and after it became the subject of an internal investigation by the Justice Department in Washington, D.C.

## III. DISCUSSION

Defendants argue that a new trial is warranted by the post-trial disclosure of this incident in order that they might avail themselves of this information for use at trial in accordance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendants further argue that the governmental misconduct exhibited by this warrantless entry by itself requires a new trial for all three Defendants. Finally, Defendants request this Court to consider this newly-supplied information as "newly discovered evidence" requiring a new trial under Fed.R.Crim.P. 33.

Plaintiff, on the other hand, takes the position that it has not brought this matter to light at this juncture because it deems a new trial appropriate. To the contrary, Plaintiff suggests that this material is not *Brady* material, as that concept has been contoured by case law and, further, that Defendants' claims of governmental misconduct have been blown all out of proportion. Plaintiff states that it has merely brought this matter to the Court's and defense counsel's attention in the "interests of fairness and justice."

### A. *Brady* Material

In order to establish a *Brady* violation, a defendant must show (1) that the prosecution has suppressed evidence; (2) that such evidence was favorable to the defendant or was exculpatory; and (3) that the evidence was material. *United States v. Bent-Santana,* 774 F.2d 1545 (11th Cir. 1985). The government here argues that Defendants have not met their burden as to any of the three prongs of this test. In order to analyze whether the Defendants have met their burden under *Brady,* it is necessary at this point to detail the facts of this case as adduced at trial.

Between March 14th and 16th, 1986, Metro–Dade police officers and various DEA agents conducted the surveillance of a warehouse district in Miami, Florida, on the suspicion that one or more cocaine manufacturing laboratories might be operating within the vicinity. This suspicion arose from a citizen complaint that the odor of

ether was apparent. The warehouses upon which the surveillance focused and at which cocaine manufacturing laboratories were ultimately discovered were located at 7754 N.W. 64 Street, Miami (referred to throughout the trial as location 1) and at 7943 N.W. 64 Street, Miami (referred to throughout the trial as location 2). During the course of the surveillance, several persons were observed in the immediate area of the warehouses wearing bright yellow construction helmets.

On the evening of March 15, 1986, Defendants Sixto Mario Arango ("Sixto") and Carlos Arturo Arango ("Carlos") were observed leaving location 1 and patronizing a nearby convenient store. Later in the evening, Carlos was observed leaving location 1 in a white van wearing a yellow construction helmet. In the pre-dawn hours of March 16, 1986, Carlos, Sixto and Simeon Rojas–Lopez ("Simeon") were seen departing location 1 in a light blue vehicle and travelling to location 2, where they dropped Carlos off, and continued travelling toward the downtown Miami area.

Sixto and Simeon were stopped and arrested shortly thereafter en route. After the arrest, keys on the person of Sixto and keys in the ignition of the vehicle that Simeon was driving were seized, along with the clothing that both were wearing and three yellow construction helmets found in the backseat of the car. The arresting officers noticed the smell of ether on the persons of Sixto and Simeon at the time of their arrest.

In the meantime, a search was conducted of location 1 at approximately 4:30 a.m. pursuant to a warrant, which search uncovered approximately six pounds of finished cocaine, all of the precursor chemicals necessary to manufacture cocaine, and various equipment used in the manufacturing of cocaine, including screens, drying stands, plastic gloves, large garbage cans, etc. A search was then conducted in the later morning hours of March 16th at location 2 with the consent of Carlos, and this search uncovered about 45 pounds of finished co-

caine, together with approximately 13 pounds of cocaine base, almost all of the precursor chemicals necessary to manufacture cocaine and the various equipment as was found at location 1 which are considered the normal paraphenalia used in the manufacturing of cocaine. At the time of Carlos' arrest, keys were seized from his person, together with the clothing he was wearing.

After waiving his rights in writing, Carlos admitted to police that he had arrived in this country from Colombia only a couple of months before, that he was solicited to come to Miami by a man named Orlando, for the express purpose of helping in the cocaine manufacturing operation and that his job within the operation was to act as a guard of sorts, staying within the warehouse and sleeping on a mattress in the back part of the warehouse, and to do custodial tasks as needed within the warehouse, in consideration for which he was to receive $1,000.00 monthly. Carlos further stated that approximately 40 to 50 pounds of cocaine had been manufactured at location 1 the night before.

The chemist at trial testified that the evidence found at location 1 comported with Carlos' statement that 40 to 50 pounds of cocaine had been manufactured at location 1 the night before. The chemist further testified that Sixto's and Simeon's clothing tested positively for traces of cocaine thereon. The chemist admitted, however, that scientific methodology did not exist to determine definitively whether the cocaine found on the clothing was the same cocaine found in either of the warehouses.

The keys that were seized from Defendants Carlos and Simeon were found to fit some but not all locks at both locations 1 and 2. The keys seized from Sixto fit all of the main locks at both locations 1 and 2.

Returning to the Defendants' burden under *Brady*, the government argues that no evidence was suppressed because the incident in question was within the knowledge of one or more of the Defendants [3] and was

---

**3.** The government claims that the incident was within Carlos' knowledge because he was

present at the Villa Regina complex at the time of the entry, although he did not witness the

briefly alluded to at trial.[4] As to the second prong of *Brady*, the government argues that the warrantless entry into Sixto's apartment is not a matter which is either favorable nor exculpatory to the Defendants.[5] In this regard, Defendants have put forth various defense theories which this information may have supported. Defense counsel asserts that had the jury known about the white powder observed at Sixto's apartment, it would have given more credence to Sixto's attempted trial defense

entry of search. It is argued that the matter was within Sixto's knowledge due to the fact that his attorney contacted the handling United States Attorney before trial, stating that his client's apartment had been "cleaned out" by someone.

4. The following references to Carlos' transportation by police to the Villa Regina Apartments were made at the hearing on Carlos' motion to suppress and at trial:

Re–Cross of Detective Angel G. Hernandez at Carlos' Motion to Suppress hearing:
"Q. Did you continue in [Carlos'] company while he was taken about in various locations in Miami?
A. That's correct.
Q. What was the purpose of all that?
AUSA Fitzgerald: Objection, Your Honor.
The Court: I am going to let him answer it and see what it leads to.
The Witness: Mr. Arango, during the course of the questioning, stated that he also went to various apartments and other warehouses, which he did not know the address or did not know how to get to these locations because of his familiarity with Miami. He was only here a month.
Q. Did you stop anywhere to get him something to eat?
A. Not right away, no.
Q. So it was formalities before food; is that correct?
A. That's definitely correct."
Hearing transcript, pp. 36–37.
Cross–Examination of Case Agent Perez
"Q. You were aware that [Carlos] was being shepherded about the county by officers?
A. Not really. I really was only told that later. That was something that I just wasn't told. I was busy on something else."
Trial transcript, p. 212.
Cross–Examination of Carlos Arturo Arango
"Q. After you were arrested, did the agents take you to that neighborhood [where Orlando lived]?
A. They took me to a location where there are some buildings.
Q. Near the center of Miami?
A. I don't know....
Q. After you were arrested, you showed the agents some vehicles at the tall apartment buildings, didn't you?
A. I didn't show vehicles to them. They already had some vehicles opened.
Q. You were taken to a parking lot after you were at DEA, weren't you? That would be by the tall buildings.

A. They took me down into a basement. There are parking lots at the bottom of it and then—
Q. This would be a parking garage?
A. Yes, it was a big parking lot.
Q. A parking garage?
A. Yes.
Q. You pointed out to the agents vehicles that you recognized, didn't you?
A. No, I did not point out any vehicles for them."
Trial transcript, pp. 346–47.
Re-direct Examination of Carlos Arturo Arango
"Q. Is it correct to state that you were taken by the officers to various locations?
A. Yes.

. . . . .

Q. Now, were these locations that you had called to their attention or locations that they tried to call to your attention?
A. They took me to different places. They changed me four or five times from different cars."
Trial transcript, p. 362.
Examination of Detective Angel Hernandez
"Q. Subsequent to your interview of Carlos Arango, did you convey him to other locations in Miami?
A. Yes, I did.
Q. Specifically, did you convey him to a parking garage to attempt to identify vehicles?
A. Yes, sir.
Q. What led you to do that?
A. Information received from other investigations in our section, a part of DEA and Metro, that we had a known address, possibly the location of other subjects involved in the case.
Q. Did the Defendant Carlos Arango indicate a willingness to identify such vehicles or subjects?
A. Yes, he did.
Q. Did he, in fact, identify any vehicles?
A. Yes, he did."
Trial transcript, pp. 399–400.

5. In fact, AUSA Fitzgerald testified at the post-trial evidentiary hearing that one of the reasons he immediately dismissed the incident in his mind as one not worthy of pursuit is because he was informed that no evidence was seized, thus precluding the necessity of a Fourth Amendment suppression hearing. Had he known of the plastic bag of white powder (and assuming, of course, that the contents were field-tested positively for cocaine), AUSA Fitzgerald testified that he would not have considered it *Brady* material as the existence of cocaine in Sixto's apartment would have only inculpated him in the sense that it would have shown his familiarity with the substance.

that the cocaine traces found on his clothing were the result of personal use of cocaine and not the manufacturing of same. Further, it is argued that the information would have provided valuable credibility/impeachment evidence for all three Defendants on key issues. Further, it is argued that the incident shows that the three Defendants were not the sole targets of the police investigation and that others, not arrested, were the actual targets of surveillance. Under this theory, it is argued that inculpating evidence against others may be exculpating as to these Defendants.[6]

The Court need not and does not reach the question of whether Defendants have satisfied their burden under the first two prongs of *Brady*. Giving the Defendants every benefit of the doubt under the first two prongs, the Court holds that Defendants have not met their burden under the third prong, namely, whether the suppressed evidence was material to the outcome of the trial.

The Supreme Court has identified three distinct situations which require a varying standard for materiality under *Brady*. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1975). They are (1) the prosecutor has not disclosed information despite a specific defense request; (2) the prosecutor has not disclosed information despite a general request for all exculpatory information or without any defense request at all; and (3) the prosecutor knows or should know that the conviction is based on false evidence. *Id.* at 103–07,

96 S.Ct. at 2397–99. To this list, this Circuit has added a fourth situation: the prosecutor fails to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific request. *Garrison v. Maggio*, 540 F.2d 1271 (5th Cir.1976). *See also United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ This case arguably falls within either the second or fourth category.[7] According to *Agurs*, where there has been no specific defense request, the failure to disclose violates due process "if the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2402. The Supreme Court has explained:

This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112–13, 96 S.Ct. at 2402. Where there is no specific defense request, or only a general request for evidence, then, the burden is on the Defendants to show that disclosure probably would be resulted in acquittal. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Barragan*, 793 F.2d 1255 (11th Cir.1986). This same stan-

---

6. This theory of defense was formulated based not only on the warrantless entry itself, but also on reports provided by the government wherein reference is made to a storefront operation at which the police documented and filmed transactions for the sale of precursor chemicals. It is difficult to see how evidence of this larger police operation could have helped or exculpated the Defendants, particularly in view of the fact that one of the rental trucks which transported the chemicals from the storefront operation was found to have been leased by Defendant Simeon Rojas–Lopez. The government maintained at the evidentiary hearing that no material relative to this storefront operation could even arguably be considered as *Brady* materials and the Court has no reason to believe otherwise.

7. As to category 1, the Court rejects Defendants' argument that Sixto's attorney's pre-trial telephone call to AUSA Fitzgerald wherein reference was made to a possible break-in of Sixto's apartment as a specific request. Additionally, this Court's standing discovery order cannot be interpreted to be sufficiently specific to warrant the heightened standard of materiality applicable to the first category. *See United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir.1978).

As to category 3, there is no claim that any of the witnesses at trial perjured themselves as to the matters testified to. The specific references to Carlos' presence at the Villa Regina Apartment complex were accurate. *See* footnote 3, *supra*.

dard for materiality has been applied in this Circuit to the category 4 situation, i.e., where purely impeaching evidence has been suppressed. *United States v. Darwin*, 757 F.2d 1193 (11th Cir.1985).

■ The Court is, therefore, placed in the difficult position of determining *post hoc* whether disclosure of this additional evidence could have, with a reasonable degree of probability, resulted in the jury's acquittal of one or more of the Defendants.[8] The Court holds that pre-trial disclosure of this warrantless entry into Sixto Mario Arango's apartment, with a reasonable degree of probability, would not have affected the jury's guilty verdict as to any of these Defendants for the following reasons.

First, without regard for impeachment/credibility purposes, which is discussed separately *infra,* the only Defendant who could have directly utilized the additional information would have been Sixto Mario Arango because it was the warrantless entry of his apartment. Defense counsel has placed great emphasis on the government's evidence of cocaine traces on Sixto's clothing as a "key" piece of evidence in the case against Sixto. The Court cannot agree with counsel's characterization of the cocaine traces on Sixto's clothing, although it certainly was one of a number of pieces of circumstantial evidence which led to his conviction.

Sixto had been observed on several occasions during the surveillance period in the warehouse district, coming and going from the cocaine laboratories. The keys that were confiscated from Sixto at the time of his arrest, unlike the keys confiscated from his co-defendants, fit all of the main doors at both cocaine laboratory locations. Sixto apparently was in possession of the master keys to the labs at the time of his arrest and this may well have been the most damaging or "key" evidence against him. As further circumstantial evidence, however, were the bright yellow construction helmets found in the backseat of the car in which Sixto was arrested, which helmets had become the subject of jokes among the surveillance team because of their high visibility qualities. Taking the record in its entirety, it is difficult to conclude that had the jury believed that Sixto was a personal user of cocaine (and, in this regard, it should be remembered that the white powder was never actually field-tested), it would have acquitted him of the cocaine manufacturing, possession or conspiracy to manufacture charges. In fact, this evidence could just as easily have hurt Sixto's defense as helped it, by showing Sixto's familiarity with the illegal substance.

With regard to the Defendants' claim that this illegal entry would have provided fodder for impeachment or credibility purposes, it should be noted initially that this is not a case where the government's entire case was dependent upon one key witness as in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Here, the Defendants' actions as observed under surveillance and Carlos' post-arrest acts of cooperation were corroborated by numerous witnesses, some of whom were not involved in the warrantless entry.

Additionally, although defense counsel has characterized his proposed use of the evidence as impeachment or credibility evidence, it could not be impeachment evi-

---

**8.** The Court would not now be forced to undertake this clairvoyant feat had the United States Attorney's office heeded the Supreme Court's advice that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399–2400. As one Court of Appeals has described the problem: "[T]he root of the problem is the prosecutor's tendency to adopt a retrospective view of materiality.... If and when the evidence emerges after trial, the prosecutor can always argue, with the benefit of hindsight, that it was not material." *United States v. Oxman*, 740 F.2d 1298, 1310 (3d Cir.

1984), as quoted in *Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 3393, 87 L.Ed.2d 481 (1985).

A prosecutor's decision to take the chance of non-disclosure, knowing that he or she will enjoy the benefit of hindsight after trial, undermines the prosecutor's duty imposed by *Brady* to aspire beyond the role of advocate to one of truth and justice seeker. *Brady*, 373 U.S. at 87 n. 2, 83 S.Ct. at 1197 n. 2 ("[The government attorney is] an advocate for a client whose business is not merely to prevail in the instant case ... but to establish justice."), quoting speech of Solicitor General before the Judicial Conference of the Fourth Circuit on June 29, 1954.

dence in the classical sense of the word, because it could not be used to contradict any of the matters actually testified to.[9]

As far as the broader concept of impeachment or credibility is concerned, i.e., to show a witness' interest, motives, prejudices, hostilities, memory capabilities, etc., counsel is attempting to argue that had the jury known that some of the testifying officers had committed a "bad act," they would not have believed their testimony. However, extrinsic evidence may not be admitted for the purpose of attacking credibility under Federal Rules of Evidence 608(b), 28 U.S.C.A. *See United States v. DiMatteo*, 716 F.2d 1361 (11th Cir.1983) (holding that government could not introduce DEA agent's testimony regarding subsequent drug-related conversations of defense witness with agent in order to attack credibility of defense witness, who testified on direct examination that he heard no discussion of marijuana at prior meeting among alleged co-conspirators). In sum, this Court concludes that the facts of this case are distinguishable from those cases where impeachment evidence was deemed crucial to the defense, thus violating the defendant's constitutional rights.

## B. Governmental Misconduct

■ Defendants next request a new trial to afford them an opportunity to argue to the jury that the warrantless entry of Sixto's apartment constitutes governmental misconduct. A Rule 33 motion for new trial may be brought "in the interest of justice" where there has been a deprivation of a constitutional right affecting the trial. *See, e.g., United States v. Fuentes–Lozano*, 580 F.2d 724 (5th Cir.1978). Further, governmental misconduct may be so egregious as to violate a defendant's Fifth Amendment due process rights. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

■ In order for governmental misconduct to rise to the level of a constitutional violation, there must be a showing that the conduct is "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *Russell* at 432, 93 S.Ct. at 1643. Under the "totality of the circumstances" test set forth in *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982), the Court does not deem the warrantless entry into Sixto Mario Arango's apartment as sufficiently outrageous to shock the universal sense of justice. *See also United States v. Ofshe*, 817 F.2d 1508 (11th Cir. 1987) (government's placing of body bug on defense attorney to monitor conversations between attorney and defendant was not so outrageous as to violate the Fifth Amendment). Nor have the Defendants been prejudiced at trial by the governmental misconduct for the reasons given within the previous discussion on *Brady*.

The Defendants argue, lastly, that this Court should invoke its supervisory power to order a new trial in the face of this governmental misconduct. Although the Supreme Court has utilized the concept of "supervisory control" within the context of discovery and disclosure abuses, *see, e.g., United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the source and scope of this power is as amorphous as the concept of a federal common law. The Supreme Court's most recent decisions refer simply to the supervisory authority of the federal courts in question. *See, e.g., United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *id.* at 513 n. 1, 103 S.Ct. at 1982 n. 1 (Stevens, J., concurring); *United States v. Payner*, 447 U.S. 727, 734–36 & n. 7, 100 S.Ct. 2439, 2445–47 & n. 7, 65 L.Ed.2d 468 (1980).

Various federal courts have employed their supervisory authority to control the conduct of the prosecutor in order to enforce ethical and professional standards and to devise sanctions for misconduct by

**9.** *See* footnote 3, *supra.*

government investigators. *See, e.g., United States v. Banks,* 383 F.Supp. 389 (D.S. D.1974) (criminal charges dismissed with prejudice because of several incidents of prosecutorial misconduct and bad faith during discovery and trial).

Recent decisions, however, reflect a growing recognition that the courts' use of supervisory power to control prosecutorial and other executive activities must be limited by separation of powers principles. *See United States v. Lau Tung Lam,* 714 F.2d 209, 210 (2d Cir.), *cert. denied,* 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 322 (1983) ("the federal judiciary's supervisory power[s] over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all"); *United States v. Kelly,* 707 F.2d 1460, 1475–76 (D.C.Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *United States v. Gervasi,* 562 F.Supp. 632, 645 (N.D.Ill.1983).

The Fifth Circuit has held that supervisory authority may not be used to dismiss an indictment for prosecutorial misconduct when the defendant was not prejudiced by the government's conduct, or when any prejudice to the defendant may be cured by a less drastic remedy. *United States v. McKenzie,* 678 F.2d 629, 631 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982). *But see United States v. Pabian,* 704 F.2d 1533, 1540 (11th Cir. 1983) (recognizing a split between the Third and Fifth Circuits on this issue, but expressing no opinion thereon).

■ The Court concludes that the extreme remedy of resort to its inherent supervisory power is not warranted under the circumstances of this case. Without in any way condoning the warrantless entry into Sixto Mario Arango's apartment by the police, nor the government's failure to promptly apprise the Court of the matter due to the government's failure to follow the normal procedures for reporting same,[10] it is this Court's duty to focus on the issue of whether these Defendants were ultimately afforded a fair trial. The Defendants were not prejudiced at trial by the fact that they did not have this information available to them, for the reasons set forth above.

## C. Newly Discovered Evidence

■ In the alternative, Defendants argue that the information recently supplied by the United States Attorney's Office constitutes "newly discovered evidence" under Rule 33, Fed.R.Crim.P. In order to prevail on a motion for new trial based on newly discovered evidence, the following elements must be shown: (1) that the evidence was discovered after the trial; (2) that failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) that the evidence was material to the issues at trial; and (4) that the nature of the evidence is such that it would probably produce an acquittal in the event of retrial. *United States v. Johnson,* 596 F.2d 147, 148 (5th Cir.1979).

■ As indicated above, the Court does not consider this "newly discovered evidence" as material to the issues at trial. Further, it is the law of this Circuit that newly discovered impeaching evidence is insufficient to warrant a new trial. *United States v. Slocum,* 708 F.2d 587 (11th Cir. 1983); *United States v. Vitrano,* 746 F.2d 766 (11th Cir.1984), *reh'g en banc denied,* 752 F.2d 649 (11th Cir.1985). Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motions for Vacatur, Dismissal, New Trial and Production of Documentation be and the same is hereby DENIED.

---

**10.** The Court notes that although this matter is already the subject of a pending internal investigation by the Justice Department, all of the matters raised at the evidentiary hearing should be further investigated by the Justice Department and, if appropriate, by the Attorney Registration and Disciplinary Commission, 203 N. Wabash, Suite 1900, Chicago, Illinois 60601, including the seemingly irreconcilable discrepancies of government witnesses at the evidentiary hearing. Because of the legal principles applicable herein and in view of the Court's analysis, it is unnecessary for the Court to resolve all of those discrepancies in this Order.